IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and | § | |
| *RESEARCH IN MOTION CORPORATION,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | **CIVIL ACTION NO. 3:08-CV-0284-G** |
| v. | § | |
| | § | |
| *MOTOROLA, INC.,* | § | |
| | § | |
| Defendant | § | |

---

**PLAINTIFF RESEARCH IN MOTION'S OPPOSITION TO
DEFENDANT MOTOROLA, INC.'S MOTION TO DISMISS OR STAY
PLAINTIFFS' ANTITRUST AND CONTRACT CLAIMS AND TO DISMISS, STAY
OR TRANSFER PLAINTIFFS' DECLARATORY JUDGMENT PATENT CLAIMS**

---

George W. Bramblett, Jr. (TSBN 02867000)
Phillip B. Philbin (TSBN 15909020)
John R. Emerson (TSBN 24002053)
HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

William F. Lee (admitted pro hac vice)
Michelle D. Miller (admitted pro hac vice)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

William J. Bohler (admitted pro hac vice)
WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, CA 94304
Telephone: (650) 858-6114
Facsimile: (650) 858-6100

Dated: May 12, 2008

**ATTORNEYS FOR PLAINTIFFS RESEARCH IN
MOTION LIMITED AND RESEARCH IN
MOTION CORPORATION**

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................3

        A.      The Role Of Mobile Wireless SDOs And IPR Policies...........................4

        B.      Motorola's FRAND Commitments And Reliance By SDOs And Industry
                Participants...............................................................................................6

        C.      The 2003 Cross License Agreement Between The Parties........................6

        D.      RIM's Emergence As A Competitive Threat............................................7

        E.      The Current Licensing Dispute Between The Parties And Motorola's Breach
                Of Its FRAND Commitment......................................................................7

        F.      RIM's Comprehensive Claims Before This Court and Motorola's Later-Filed
                Actions. ....................................................................................................8

III.    ARGUMENT......................................................................................................10

        A.      RIM's FRAND Contract Claims Properly State A Cause Of Action....................10

                1.      Motorola Does Not Dispute That Its FRAND Commitments Create An
                        Enforceable Contract. ...............................................................10

                2.      RIM Has Adequately Alleged That Motorola Has Breached Its
                        FRAND Commitments. ..............................................................11

                3.      RIM Has Been Injured By Motorola's Refusal To Provide A FRAND
                        Royalty.......................................................................................11

                4.      RIM Is Entitled To A Declaration That Motorola Has Breached Its
                        FRAND Obligations. .................................................................13

        B.      RIM's Claim That Motorola Is In Breach Of The 2003 License Agreement
                Properly States A Cause Of Action. .......................................................13

        C.      RIM Has Pled Sufficient Facts To Establish That Motorola's Conduct
                Violated Section 2 Of The Sherman Act. ...............................................15

                1.      Motorola Possesses Monopoly Power In The Relevant Technology
                        Markets. .....................................................................................16

                2.      Motorola's Breach Of Its FRAND Commitments Was Part Of A
                        Deliberate Course Of Conduct That Subverted Competitive Standards-
                        Setting Processes And Constitutes Exclusionary Conduct. ......17

                3.      RIM Has Pled Sufficient Facts To Establish Antitrust Standing.............24

                4.      Motorola's Claim That RIM Has Not Pled Injury To Competition Or
                        Its Own Injury With Adequate Specificity Is Without Merit. ..................28

        D.      The Parties' Patent, Contract, and Antitrust Claims Should Remain
                Consolidated. ..........................................................................................30

1.    The Claims Substantially Overlap And Should Be Litigated In The Same Forum. ...............................................................................30

2.    If The Court Ultimately Determines That A Single Trial Would Be Unwieldy, The Court Can Segregate The Claims For Trial Purposes. .......33

3.    Separating The Claims For Discovery Purposes Would Complicate – Not Simplify – The Pretrial Process. ...........................................34

E.    The Court Should Not Dismiss Or Transfer RIM's Declaratory Judgment Claims Based On Motorola's Patents. ....................................................35

1.    The Federal Circuit Has Confirmed That The Primary Factors To Be Considered Are The Convenience And Suitability Of The Competing Forums. ...................................................................................36

2.    The Northern District Of Texas Is The More Appropriate Forum For The Claims. ...............................................................................37

3.    Proceeding With RIM's Declaratory Claims In This District Will Avoid Piecemeal Litigation. ..................................................43

4.    Motorola's Choice Of Forum Is Not Entitled To Undue Deference, Particularly Where, As Here, Motorola Has Chosen A Forum With No Connection To The Parties Or The Evidence. ...........................................43

F.    The Court Should Not Stay RIM's Contract And Antitrust Claims. ....................45

G.    If The Court Decides To Segregate the Claims for Separate Trials, The Court Should Order An Early Trial On The FRAND Contract Claim. ..........................46

IV.    CONCLUSION...................................................................................50

# TABLE OF AUTHORITIES

Federal Cases

*Abbott Labs. v. Selfcare, Inc.*,
   2000 U.S. Dist. LEXIS 15263 (D. Mass. Sept. 29, 2000) ....................................................... 33

*Affymetrix, Inc. v. PE Corp. (N.Y.)*,
   219 F. Supp.2d 390 (S.D.N.Y. 2002)...................................................................................... 46

*Akzona Inc. v. E.I. Du Pont De Nemours & Co.*,
   607 F. Supp. 227 (D. Del. 1984)............................................................................................ 46

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988)........................................................................................... 18, 19, 23

*Amberwave Systems Corp. v. Intel Corp.*,
   2005 WL 2861476 (E.D. Tex. Nov. 1, 2005) ................................................................... 32, 44

*American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982).............................................................................................................. 19

*ASM Am. Inc. v. Genus, Inc.*,
   2002 WL 24444 (N.D. Cal. Jan. 9, 2002) ............................................................................. 46

*Aventis Pharms. Inc. v. Teva Pharms. USA Inc.*,
   2007 WL 2823296 (E.D. Tex. Sept. 27, 2007) ...................................................................... 43

*Avery Dennison Corp. v. Acco Brands, Inc.*,
   2000 WL 986995 (C.D. Cal. Feb. 22, 2000)..................................................................... 12, 26

*Axiom Advisers and Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*,
   2006 WL 1049997 (E.D. Cal. Mar. 20, 2006) ................................................................. 12, 26

*B&P Holdings I, LLC v. Grand Sasso, Inc.*,
   114 F. App'x 461 (3d Cir. 2004) .......................................................................................... 14

*Bank One, N.A. v. Euro-Alamo Investments, Inc.*,
   211 F. Supp. 2d 808 (N.D. Tex. 2002) ................................................................................. 40

*Baxter Int'l Inc. v. Cobe Lab. Inc.*,
   1992 WL 77665 (N.D. Ill. 1992) .......................................................................................... 46

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007)..................................................................................................... 29, 30

*Bell v. Dow Chemical Co.*,
　847 F.2d 1179 (5th Cir. 1988) ........................................................ 24

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
　152 F.3d 588 (7th Cir. 1988) ........................................................ 26

*Bose Corp. v. Sunshine Electronics of N.Y., Inc.*,
　2006 WL 1027684 (N.D. Tex. April 12, 2006) ........................................ 42

*BP Chemicals Ltd. v. Union Carbide Corp.*,
　4 F.3d 975 (Fed. Cir. 1993) ........................................................ 45

*Bridgmon v. Array Sys. Corp.*,
　325 F.3d 572 (5th Cir. 2003) ........................................................ 11

*Broadcom Corp. v. Qualcomm, Inc.*,
　501 F.3d 297 (3d Cir. 2007) ................................................... passim

*Broadcom Corp. v. Qualcomm Inc.*,
　No. 05-CV-03350 (D.N.J. filed Jul. 1, 2005) ........................................ 48

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
　429 U.S. 477 (1977) ............................................................... 25, 28

*Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.*,
　2003 WL 22213116 (D. Minn. Sept. 20, 2003) ........................................ 32

*Cargill, Inc. v. Monfort of Colo., Inc.*,
　479 U.S. 104 (1986) ................................................................ 25

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
　2006 WL 13058 (N.D.Cal. Jan. 3, 2006) .............................................. 46

*CVD, Inc. v. Raytheon Co.*,
　769 F.2d 842 (1st Cir. 1985) ................................................. 12, 26, 27

*Dairy Foods Inc. v. Dairy Maid Products Coop.*,
　297 F.2d 805 (2d Cir. 1961) ........................................................ 27

*DeForest Radio, Tel. & Tel. Co. v. United States*,
　273 U.S. 236 (1927) ................................................................ 10

*Digeo, Inc. v. Gemstar-TV Guide Int'l, Inc.*,
　2007 WL 295539 (W.D. Wash. Jan. 29 2007) .................................... 32, 33, 35

*Dimmitt Agri Industries, Inc. v. CPC Intern. Inc.*,
　679 F.2d 516 (5th Cir. 1982) ........................................................ 24

*Eastman Med. Prods., Inc. v. E.R. Squibb & Sons, Inc.*,
   199 F. Supp. 2d 590 (N.D. Tex. 2002) ................................................. 39

*Electronics For Imaging, Inc. v. Coyle*,
   394 F.3d 1341 (Fed. Cir. 2005) ............................................... 37, 45

*EMC Corp. v. Norand Corp.*,
   89 F.3d 807 (Fed. Cir. 1996) .................................................. 45

*Empty Barge Lines II, Inc. v. Dredge Leonard Fisher*,
   441 F. Supp. 2d 786 (E.D. Tex. 2006) ........................................ 43

*Ericsson Inc. v. Samsung Elecs. Co.*,
   2007 WL 1202728 (E.D. Tex. Apr. 20, 2007) ........................ 46, 47, 49

*Ericsson Inc. v. Samsung Elecs. Co.*,
   No. 06-CV-63, Doc. No. 81 (E.D. Tex. Jul. 11, 2007) ..................... 47

*Ericsson Radio Sys., Inc. v. Interdigital Commc'ns Corp.*,
   No. 93-CV-1809 (N.D. Tex. filed Sept. 9, 1993) ...................... 47, 48

*ESS Tech., Inc. v. PC-Tel, Inc.*,
   2001 WL 1891713 (N.D. Cal. Nov. 28, 2001) ............................. 50

*Foseco, Inc. v. Consol. Aluminum Corp.*,
   851 F. Supp. 369 (E.D. Mo. 1991) ........................................... 35

*Genentech, Inc. v. Eli Lilly & Co.*,
   998 F.2d 931 (Fed. Cir. 1993) .............................................. 39

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ......................................... 50

*Green v. Burlington N. & Santa Fe Railway Co.*,
   2006 WL 154329 (N.D. Tex. Jan. 19, 2006) ................................. 42

*Hanby v. Shell Oil Co.*,
   144 F. Supp. 2d 673 (E.D. Tex. 2001) ...................................... 39

*Handgards, Inc. v. Ethicon, Inc.*,
   743 F.2d 1282 (9th Cir. 1984) ........................................... 13, 26

*Harris Corp. v. Ericsson, Inc.*,
   No. 98-CV-2903 (N.D. Tex. filed Dec. 10, 1998) .......................... 48

*Hayes v. Solomon*,
   597 F.2d 958 (5th Cir. 1979) .............................................. 18

*Hynix Semiconductor Inc. v. Rambus Inc.*ˏ
    441 F. Supp. 2d 1066 (N.D. Cal. 2006) .......................................................... 22, 24

*Hynix Semiconductor, Inc. v. Rambus Inc.*,
    2008 WL 73689 (N.D. Cal. Jan. 5, 2008) .................................................... 16

*Illinois Tool Works Inc. v Indep. Ink, Inc.*,
    547 U.S. 28 (2006).......................................................................................... 16

*In re Data Gen. Corp. Antitrust Litig.*,
    510 F. Supp. 1220 (J.P.M.L. 1979).................................................................. 32

*In re Ephedra Prods. Liab. Litig.*,
    314 F. Supp. 2d 1373 (J.P.M.L. 2004)............................................................. 35

*In re Halftone Color Separations ('809) Patent Litigation*,
    2008 WL 1393026 (J.P.M.L. Apr. 10, 2008)................................................... 50

*In re Innotron Diagnostics*,
    800 F. 2d 1077 (Fed. Cir. 1986)...................................................................... 46

*In re Rambus*,
    2007 WL 431524 (F.T.C. Feb. 5, 2007) .......................................................... 49

*In re: Horseshoe Entertainment*,
    337 F.3d 429 (5th Cir. 2003) ................................................................... 41, 44

*In re: Volkswagen AG*,
    371 F.3d 201 (5th Cir. 2004) ................................................................... 41, 42

*Ins. Co. of the West v. Fort Worth Indep. Sch. Dist.*,
    2005 WL 3453959 (N.D. Tex. Dec. 15, 2005) ................................................. 43

*Kerotest Mfg. Co. v. C-O-Two Fire Equip Co.*,
    342 U.S. 180 (1952)........................................................................................ 39

*Kumar v. Hyundai Semiconductors, Inc.*,
    1999 WL 202543 (N.D. Tex. March 31, 1999) ................................................ 43

*LePage's Inc. v. 3M*
    3M, 324 F.3d 141 (3d Cir. 2003)..................................................................... 22

*Mill Creek Press, Inc. v. Thomas Kinkade Co.*,
    2004 WL 2607987 (N.D. Tex. Nov. 16, 2004).................................................. 44

*McCoy v. Mitsuboshi Cutlery, Inc.*,
    67 F.3d 917 (Fed. Cir. 1995)........................................................................... 10

*MedImmune, Inc. v. Genentech, Inc.*,
    127 S. Ct. 764 (2007) .................................................................................... 13, 36, 45

*Micron Technology, Inc. v. MOSAID Technologies, Inc.*,
    518 F3d. 897 (Fed. Cir. 2008) ..................................................................... passim

*Minka Lighting, Inc. v. Trans Globe Imports, Inc.*,
    2003 WL 21251684 (N.D. Tex. May 23, 2003) ............................................ 41, 45

*Motorola, Inc. v. Interdigital Tech. Corp.*,
    No. 93-CV-00488 (D. Del. filed Oct. 8, 1993) ......................................................... 48

*Motorola, Inc. v. Analog Devices, Inc.*,
    No. 03-CV-131, Doc. No. 105 (E.D. Tex. Apr. 9, 2004) ....................................... 34

*Motorola, Inc. v. Kimball Int'l, Inc.*,
    601 F. Supp. 63 (N.D. Ill. 1984) ................................................................... 27, 28

*Nokia Corp. v. Qualcomm, Inc.*,
    2006 WL 2521328 (D. Del. Aug. 29, 2006) ............................................................ 49

*PharmAthene, Inc. v. SIGA Techs. Inc.*,
    2008 WL 151855 (Del. Ch. Jan. 16, 2008) ............................................................. 14

*Precis, Inc. v. Fed. Ins. Co.*,
    2005 U.S. Dist. LEXIS 12678 (N.D. Tex. June 27, 2005) ...................................... 43

*Qualcomm Inc. v. Broadcom Corp.*,
    No. 05-CV-1392, Doc. No. 493 (S.D. Cal. Dec. 6, 2006) ...................................... 34

*Rambus Inc. v. Federal Trade Comm'n*,
    --- F.3d ---, 2008 WL 1795594 (D.C. Cir. Apr. 22, 2008) .................................... 21

*Rambus, Inc. v. Infineon Technologies AG*,
    330 F. Supp. 2d 679 (E.D. Va. 2004) ..................................................... 18, 19, 20

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
    63 F. Supp. 2d 1218 (E.D. Cal. 1999).......................................................... 12, 26

*Research In Motion Ltd. v. Visto Corp.*,
    2007 WL 1452092 (N.D. Tex. May 17, 2007) ................................................. 33, 42

*Research In Motion Ltd. v. Visto Corp.*,
    457 F. Supp.2d 708 (N.D. Tex 2006) ..................................................................... 33

*Richter, S.A. v. Bank of Am. Nat'l Trust and Sav. Assoc.*,
    939 F.2d 1176 (5th Cir. 1991) ............................................................................... 14

*Sabre, Inc. v. Northwest Airlines, Inc.*,
  2004 WL 2533867 (N.D. Tex. Nov. 8, 2004) ..................................................... 39

*Samsung Elecs. Co. v. Interdigital Commc'ns Ltd., et al.*,
  No. 07-CV-00167 (D. Del. filed Mar. 23, 2007) ................................................. 48

*Seiko Epson Corp. v. Optoma Tech., Inc.*,
  2007 WL 1793776 (N.D. Cal. June 19, 2007) ..................................................... 35

*Spiegelberg v. Collegiate Licensing Co.*,
  402 F. Supp. 2d 786 (S.D. Tex. 2005) ........................................................... 41, 42

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) .......................................................................... 23

*Texas Instruments Inc. v. Micron Semiconductor, Inc.*,
  815 F. Supp. 994 (E.D. Tex. 1993) ................................................................. 32

*Toshiba Corp. v. Hynix Semiconductor, Inc.*,
  2005 WL 2415960 (N.D. Tex. Sept. 30, 2005) ......................................... 32, 33, 34

*Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ...................................................................................... 15

*Walker v. State Farm Lloyd's*,
  2004 WL 1462200 (N.D. Tex. Jun. 28, 2004) ..................................................... 13

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ....................................................................... 10

*Whistler Group, Inc. v. PNI Corp.*,
  2003 WL 22939214 (N.D. Tex. Dec. 5, 2003) ............................................. passim

*Wilton v. Seven Falls Co.*,
  515 U.S. 277 (1995) ...................................................................................... 37

*Yett v. Peters*,
  2008 WL 177873 (E.D. Tex. Jan. 18, 2008) ....................................................... 41

State Cases

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*,
  232 S.W.3d 883 (Tex. App. 2007) ................................................................... 13

*Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*,
  192 S.W.3d 780 (Tex. 2006) ........................................................................... 13

*Estate of Arlitt v. Paterson*,
  995 S.W.2d 713 (Tex. App. 1999) ................................................................... 13

*Frost Nat'l Bank v. Burge*,
    29 S.W.3d 580 (Tex. App. 2000) ................................................................................ 11

*Gillenardo v. Connor Broad. Del. Co.*,
    2002 WL 991110 (Del. Super. Ct. Apr. 30, 2002) .................................................. 14

*Graham v. Mary Kay Inc.*,
    25 S.W.3d 749 (Tex. App. 2000) ................................................................................ 12

*Hammond & Tayylor, Inc. v. Duffy Tingue Co.*,
    161 A.2d 238 (Del. Ch. 1980) .................................................................................. 14

*Hindes v. Wilmington Poetry Soc'y*,
    138 A.2d 501, 503-504 (Del. Ch. 1958) ................................................................ 14

*Int'l Equity Capital Growth Fund v. Clegg*,
    1997 WL 208955 (Del. Ch. Apr. 22, 1997) .......................................................... 14

*John Wood Group USA, Inc. v. ICO, Inc.*,
    26 S.W.3d 12 (Tex. App. 2000) ................................................................................ 15

*Liquor Exchange, Inc. v. Tsaganos*,
    2004 WL 1254166 (Del. Ch. Jun. 2, 2004) .......................................................... 14

*Nokia Corp. v. Qualcomm, Inc.*,
    C.A. No. 2330-VCS (Del. Ch. filed Aug. 9, 2006) .................................................. 49

*Nokia Corp. v. Qualcomm Inc., C.A. No.*
    2330-VCS, Doc. No. 787 (Del. Ch. Feb. 21, 2008) .............................................. 48

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*,
    84 S.W.3d 212 (Tex. 2002) ...................................................................................... 13

*W.R. Grace & Co.-Conn. v. Taylor*,
    2007 WL 1438544 (Tex. App. May 17, 2007) ...................................................... 12

<u>Federal Statutes</u>

15 U.S.C. § 15(a) .......................................................................................................... 25

15 U.S.C. § 26 .............................................................................................................. 25

28 U.S.C. § 1404(a) ...................................................................................................... 40

28 U.S.C. § 1407 .......................................................................................................... 34

28 U.S.C. § 2201 .......................................................................................................... 36

28 U.S.C. § 2201(a) ...................................................................................................... 13

Secondary Sources

28 Am. Jur. 2d Estoppel and Waiver § 57 (2000) ........................................................................ 13

Restatement (Second) of Contracts § 90(1) (1981) ................................................................... 13

## I.    __INTRODUCTION__

As Motorola's brief reflects, this case arises out of a significant licensing dispute between the parties.  RIM has, for many years, been a licensee of patents that Motorola claims are "essential" to several industry-wide wireless communication standards.  Motorola convinced the relevant standard-setting organizations to adopt the technologies over which it claims patent rights by promising to license its patents to others on fair, reasonable, and non-discriminatory ("FRAND") terms.  Motorola's commitment to license its patents on FRAND terms was the very condition on which its technologies were selected by the standard-setting organizations, a condition aimed at ensuring that Motorola would not be able to use its control over the standards to gain an unfair advantage in the marketplace.  But this is exactly what Motorola is now attempting to do.

In 2003, Motorola and RIM entered into a written cross-license agreement specifying the terms that would govern Motorola's license of the patents that it claims are "essential" to the standards.  The license agreement also granted each of the parties certain rights to the other party's non-essential patents.  The parties agreed that these terms would govern the license over the next five years, and that they would negotiate in good faith to agree on a new written license in 2007.

Over the five year term of the agreement, however, the competitive situation between the parties changed substantially.  RIM achieved significant growth in its popular line of BlackBerry® devices and its accompanying wireless e-mail server technology.  Motorola, in contrast, not only failed to achieve significant growth in its line of competing "smart phones," but also suffered substantial declines in sales of its traditional cell phone handsets.

Motorola is now attempting to use the renegotiation of the parties' license agreement to attempt to make up for these losses in the marketplace, and to artificially inflate the price of RIM's products by substantially increasing its royalty costs.  During the parties' negotiations in late 2007, Motorola demanded exorbitant royalties for the patents that it claims are essential – despite its commitment to the relevant standards organizations to license these patents to

competitors, like RIM, on FRAND terms.  It also threatened to file suit against RIM based on its non-essential patents (and ultimately did file such a suit in the Eastern District of Texas).  And it refused to attribute any value to RIM's own patents, even though Motorola's products are clearly infringing those patents.

Motorola suggests, in the memorandum supporting its motion to dismiss, that RIM has "manufactured" this lawsuit in order to obtain a "sweetheart deal" in the parties' licensing negotiations.  In fact, RIM seeks only the fair, reasonable, and non-discriminatory royalty rates that Motorola committed to providing.

Motorola challenges not only the substance of RIM's allegations, but also RIM's decision to consolidate all of the claims between the parties in a single action in this Court.  It contends that RIM's claims are actually "three separate lawsuits," and that the Court should dismiss or bifurcate RIM's contract and antitrust claims, and transfer its declaratory claims based on Motorola's patents to the Eastern District of Texas.

The Court should reject these arguments.  <u>First</u>, RIM has plainly alleged facts sufficient to support its contract and antitrust claims.  In fact, Motorola does not even attempt to dispute that its FRAND commitments are enforceable contracts.  Instead, it claims that RIM has not adequately alleged any breach or injury, and that the Complaint raises a "mere licensing dispute" not actionable under the antitrust laws.  Each of these arguments can be easily dismissed:

- Motorola has breached its FRAND contract by refusing to license the patents that it claims are "essential" on FRAND terms.
- Motorola has violated Section 2 of the Sherman Act by wrongfully excluding competing technologies that perform the functions covered by Motorola's claimed essential patents for the standards at issue by first making FRAND commitments to standard-setting organizations (that were a pre-condition to having its patented technology included) and then reneging on those commitments.
- Motorola's exclusionary conduct injured – indeed eliminated – competition in the relevant technology markets, and caused injury to RIM as a consumer of such technology and as a competitor to Motorola in the downstream markets for wireless mobile products and services.
- Motorola's wrongful conduct has resulted in substantial and ongoing injuries to RIM, damaging RIM's reputation, product image, and market goodwill, and making it difficult for RIM to accurately price its products.

<u>Second</u>, the Court should reject Motorola's alternative request that the Court bifurcate

and stay RIM's contract and antitrust claims – the claims at the center of this litigation – until after the resolution of the parties' patent claims. Motorola premises this request on clearly distinguishable cases, involving contingent "sham litigation" counterclaims alleging that the patent holder's claims for infringement are baseless. In this case, by contrast, RIM's contract and antitrust claims are not contingent, and will require resolution regardless of the outcome of the patent claims. As recently recognized in a similar case, involving a FRAND dispute between Samsung and Ericsson, the appropriate FRAND royalty rate is a central issue and should be tried *before* related patent claims. The Northern District of Texas has considerable experience in this area, as Judge Lynn has overseen two significant cases implicating FRAND/RAND royalty issues in cases involving GSM patents.

Third, the Court should reject Motorola's request that the Court transfer RIM's declaratory claims based on Motorola's patents to the Eastern District of Texas – a forum with *no* connection to the parties or the dispute. The claims are clearly related and should be litigated together in the Northern District of Texas, where both parties have substantial operations. RIM's BlackBerry® devices are configured, packaged, and distributed from a facility in Carrollton, Texas, located in the Northern District of Texas, which has shipped over 10 million units. Motorola appears to have assembled, packaged, and distributed a similarly high volume of cell phones from a facility in Fort Worth.

In short, RIM's claims not only state substantial causes of action, but also are clearly related, and should be litigated together in the same court. Separating the claims into multiple lawsuits – as Motorola urges – would considerably complicate the litigation, and would almost certainly result in two separate courts considering the same issues. If the Court believes a single trial would be unwieldy, it can segregate the claims for trial purposes and try them in a logical order.

## II.    STATEMENT OF FACTS

RIM's claims against Motorola arise out of failed negotiations for a patent cross-license agreement in which RIM sought to obtain a fair, reasonable and non-discriminatory ("FRAND")

license to a portfolio of patents that Motorola had promised standards development organizations ("SDOs") it would license on FRAND terms as well as certain other "non-essential" Motorola patents.  In addition, Motorola would obtain cross licenses to certain standards-essential and non standards-essential RIM patents.  Motorola's wrongful repudiation of its promises to two mobile wireless SDOs – the European Telecommunications Standards Institute ("ETSI") during the development of the GSM, GPRS, UMTS standards, and the Institute of Electrical and Electronics Engineers ("IEEE") during the development of the WLAN standard – constitute breaches of contract and unlawful monopolization of markets for technologies that perform functions covered by the pertinent standards.  These GSM, GPRS, UMTS  and WLAN technologies are used by manufacturers like RIM in "downstream" markets for mobile wireless products and services, including the downstream markets for mobile wireless handsets and e-mail server technology in which RIM and Motorola compete.  Compl., ¶¶ 29-37 (App. 147-48).

A.    **The Role Of Mobile Wireless SDOs And IPR Policies**

The standards at issue (GSM, GPRS, UMTS, and WLAN) are intended to provide interoperability among manufacturers of mobile wireless devices and services, and thereby enhance consumer welfare.  Consumers of wireless communication devices and service providers (such as AT&T Wireless, Verizon Wireless and T-Mobile) demand universal interoperability among competing handset product lines, making it commercially impossible to market a wireless handset that is incapable of communicating with devices made by competing manufacturers or connecting to all service provider networks.  Compl., ¶ 20 (App. 144).  Mobile wireless device manufacturers spend significant development resources to market these compatible products; before they commit to those investments, they require assurance that their introduction  of compatible products will not be stymied by a competitor's patent rights.  To facilitate the need for interoperability and to protect manufacturers against patent foreclosure, SDOs, like ETSI and IEEE, develop standard specifications for mobile wireless technologies and promulgate intellectual property rights ("IPR") policies designed to ensure that SDO members

and others practicing the standards will have access to all essential technology on FRAND terms (sometimes alternatively referred to as "RAND," reasonable and non-discriminatory, terms). *Id.*, ¶¶ 25, 27 (App. 145, 146).[1]

The IPR policies that governed the development of the standards at ETSI provide that, if an owner of an essential IPR refuses to undertake a FRAND commitment with respect to that IPR, then, as provided in Section 8 of the ETSI IPR Policy, ETSI may suspend work on relevant parts of the standard or redesign the standard to render the IPR non-essential. *Id.*, ¶ 54 (App. 154). ETSI's IPR policy had the stated objective to "reduce the risk" to those implementing the standards "that investment in the preparation, adoption and application of the standards could be wasted as a result of an essential IPR for a standard or technical specification being unavailable." *Id.*, ¶ 55 (App. 154). Similarly, the IEEE IPR policy provides that if RAND commitments are not provided for essential patents, the IEEE working group either will revise the standard so that compliance can be achieved without infringing the patent(s), or will discontinue work on the standard altogether. *Id.*, ¶ 72 (App. 158).

These IPR policies enable participants in standards development to choose among competing technologies with the assurance that an owner of patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby prevented from keeping parties seeking to implement the standard from doing so by imposing undue costs or burdens on them. Indeed, competing technologies may become obsolete as a result of not being selected for the standard. *Id.*, ¶ 27 (App. 146).

Once a standard has been adopted, patents that are essential to that standard – *i.e.*, those that claim technologies selected by the participants in the standards development process for inclusion in a standard – gain significance that they would not have had but for adoption of the

---

[1]     ETSI's IPR policy provides for licensing commitments to be made on fair, reasonable, and non-discriminatory ("FRAND") terms. The IEEE provides for licensing commitments to be made on reasonable and non-discriminatory ("RAND") terms. In this Memorandum, the term "FRAND" will be used to refer to both sets of commitments.

standard.  Companies such as RIM that produce products implementing a standard become "locked in" to the technologies included in the standard.  Accordingly, the owners of patents essential to a standard gain market power that is unrelated to the inherent value of the inventions claimed in their patents and is instead derived from the fact that their patented technologies have been incorporated in the standard.  Compl., ¶ 23 (App. 145]).  Patent owners that fail to honor FRAND commitments they have made are able to exploit the standard-setting process to impose unjustified and abusive costs on their commercial rivals.  That is precisely what Motorola is doing to RIM.  *Id.*, ¶ 28 (App. 146).

### B.    Motorola's FRAND Commitments And Reliance By SDOs And Industry Participants

Motorola actively induced ETSI and IEEE members to include technology Motorola claimed to own in the relevant standards.  ETSI and IEEE participants relied on Motorola's FRAND commitments.  The SDOs' decision to incorporate the relevant technologies into the standards was *conditioned on Motorola's compliance with those FRAND commitments*.  Compl., ¶¶ 62-63, 66, 75, 79 (App. 155, 156, 158, 159).  In fact, had Motorola disclosed that it was going to renege on its promise to license its claimed essential patents on FRAND terms, the technology Motorola's patents claim to cover would not have been included in the standards, and Motorola would not be an essential patent holder.  *Id.*, ¶¶ 50, 72 (App. 152, 158).  Motorola's ultimately false FRAND promises foreclosed competing technologies in each of the markets for technologies that perform the functions covered by Motorola's claimed essential patents.  Those competing technologies are no longer viable options because manufacturers producing products in the downstream market for mobile wireless devices, such as RIM, must employ the *selected* standard.  *Id.*, ¶¶ 94-103, 108-09 (App. 163-65, 166-67).

### C.    The 2003 Cross License Agreement Between The Parties

In 2003, RIM and Motorola entered into a five-year Cross License Agreement ("2003 License Agreement") (App. 67), specifying the terms that would govern Motorola's license of the patents that it claims are "essential" to the ETSI and IEEE wireless standards.  Compl., ¶ 84

(App. 160).  The 2003 License Agreement also gave each of the parties rights to certain of the other parties' non-essential patents.  The parties also agreed that they would begin good faith negotiations to extend the terms and conditions of the licenses in 2007.  *Id.*, ¶ 85 (App. 161).

### D.    RIM's Emergence As A Competitive Threat

During the five-year term of the 2003 License Agreement, the competitive situation between RIM and Motorola changed substantially.  RIM achieved significant growth in its popular line of BlackBerry® devices (which offer telephone, e-mail, Internet, text messaging, and other advanced capabilities) and in its accompanying wireless e-mail server technology.  Compl., ¶ 86 (App. 161).  With these products, RIM emerged as a robust competitor in the wireless communications field – with RIM's products attracting sales volume that previously had belonged to traditional communication companies like Motorola.

In response to RIM's success, Motorola devoted significant resources to developing products and services similar to RIM's.  In mid-2006, Motorola introduced the "Q" smart phone, which, like most BlackBerry® devices, enables e-mail and Internet, and includes a full QWERTY keyboard.  *Id.*, ¶ 34 (App. 147).  Later the same year, Motorola announced the acquisition of Good Technology, a company with mobile computing technology that competes with RIM's BlackBerry Enterprise Server technology.  *Id.*, ¶ 36 (App. 148).  Despite its efforts, Motorola has not been able to replicate the success of RIM's products.  The "Q" phone has not been as popular as RIM's BlackBerry® devices.  *Id.*, ¶ 34 (App. 147).  Motorola has suffered declines in market share for wireless handset devices, and has been unable to stem its losses in this area.  *Id.*, ¶ 38 (App. 149).

### E.    The Current Licensing Dispute Between The Parties And Motorola's Breach Of Its FRAND Commitment

Motorola is now attempting to use the renegotiation of the parties' 2003 License Agreement to make up for its losses in the marketplace, and to injure RIM and consumers by artificially inflating the price of RIM's products by substantially increasing its costs.  Rather than negotiate in good faith to extend the terms and conditions of the license, Motorola has demanded

unfair and anticompetitive royalties from RIM and has coupled these demands with threats of patent litigation.

During the parties' negotiations from June 2007 through February 2008, Motorola demanded royalty rates for its claimed "essential" patents that are multiple times the imputed rate of the 2003 License Agreement – royalty rates that not only conflicted with the good-faith-bargaining requirements of the 2003 License Agreement, but also contravened Motorola's commitment and obligation to license the patents on FRAND terms.  Compl., ¶¶ 89, 91 (App. 162).  Motorola also used its non-essential patents as additional coercive leverage, threatening to assert these patents against RIM and to seek injunctive relief.  *Id.*, ¶ 90 (App. 162).  And Motorola refused to attribute any value to RIM's own patents, which Motorola is clearly infringing.

Motorola's refusal to negotiate a FRAND rate has resulted in significant ongoing injuries to RIM's business and goodwill, including the uncertainty that now impacts RIM's products and its inability accurately to forecast its costs for purposes of setting the price for its products.  *Id.*, ¶¶ 166, 178, 184 (App. 177, 179, 180).  Moreover, RIM has expended and continues to expend substantial internal resources and has incurred substantial attorneys fees in its failed license negotiations with Motorola and defending against Motorola's anticompetitive conduct.

F.      **RIM's Comprehensive Claims Before This Court and Motorola's Later-Filed Actions**

RIM filed its Complaint in this District at the conclusion of a standstill agreement between the parties, raising substantially all of the issues arising out of the parties' licensing dispute.  Shortly after RIM initiated this action, Motorola filed two separate lawsuits in two separate courts.  Motorola filed affirmative patent infringement claims based on its own patents in the Eastern District of Texas – a forum with no connection to the parties or the dispute.  It also filed declaratory claims based on RIM's patents in the District of Delaware.

These three actions raise substantially overlapping issues, and plainly should be litigated together in the same forum.  As further discussed *infra*, the same RIM and Motorola

technologies and devices are at the center not only of the patent claims, but also the contract and antitrust claims. The claims will involve not only overlapping technical issues, but also overlapping competition, market, and licensing issues. *See* Declaration of Randall W. Mishler, Esq., May 12, 2008 ("Mishler Decl."), ¶¶ 16-20 (App. 5-7).

There also should be no question that the Northern District of Texas – where ***both*** parties have substantial operations – is the appropriate forum to resolve these disputes. RIM Corporation, the United States subsidiary of RIM Limited and a party to each of Motorola's actions, has its principal offices in the Northern District (Irving). Mishler Decl., ¶ 21 (App. 7). RIM's Irving facility currently includes substantially ***all*** of RIM's licensing and standards employees, along with engineering, software development, and customer service employees – approximately 230 total RIM employees. *Id.*, ¶¶ 22, 24 (App. 7, 8). RIM's licensing and standards employees, along with their documents, will be central to RIM's contract and antitrust claims, as well as the damages issues for both parties' patent claims. *Id.*, ¶ 24 (App. 8).

Motorola also has significant operations in the Northern District. Motorola employs over 1,000 people at a facility in Fort Worth, Texas at which it manufactures semiconductors and communication devices. *Id.*, ¶ 26 (App. 8). Indeed, six of the named inventors on Motorola's asserted patents were based in the Northern District when they filed their patent applications: Mr. Gregory Lewis Cannon (Keller), Mr. David P. Kilp (Colleyville), and Mr. Nick P. Lagen (Forth Worth), the named inventors of the '447 Patent; and Mr. John D. Deletic (Dallas), Mr. Vick T. Cox (Plano), and Mr. John A. Davis (Plano), the named inventors of the '211 Patent. *Id.*, ¶ 27 (App. 8).

The dispute between the parties also has a substantial connection to the Northern District. The parties' negotiations relating to the extension of the 2003 License Agreement included at least six face-to-face meetings at RIM's U.S. headquarters in Irving, including meetings on August 27, September 12, October 1, November 19, November 29, and December 14, 2007. *Id.*, ¶ 11 (App. 4).

The Eastern District of Texas – in stark contrast – has no connection to the parties or their

dispute.  *Id.*, ¶¶ 11, 25, 28 (App. 4, 8, 9).

## III.    ARGUMENT

### A.    RIM's FRAND Contract Claims Properly State A Cause Of Action.

Motorola does not dispute – nor could it – that its commitments to ETSI and IEEE to license its essential patents on FRAND terms create binding contracts enforceable by RIM. Instead, Motorola argues only that RIM has failed to adequately allege that Motorola breached the contract, or that it has been injured.  Both arguments are easily dismissed.

#### 1.    Motorola Does Not Dispute That Its FRAND Commitments Create An Enforceable Contract.

Motorola does not dispute that FRAND commitments create an enforceable contract.  As alleged in the Complaint, Motorola committed to license its essential patents to others on FRAND terms if the technologies over which it claimed patent rights were included in the relevant standards.  *See* Compl., ¶¶ 3, 59-60, 74 (App. 155, 158).  The standards organizations relied on these commitments in adopting the standards; companies like RIM have similarly relied on these commitments in developing standards-compliant products.  *Id.*, ¶¶ 3, 63-67, 74-82 (App. 138, 155-57, 158-60).  Motorola, by its conduct, accordingly has granted a license to standards-implementers like RIM to practice its patents.  *Id.*, ¶¶ 64, 76, 163 (App. 156, 158, 176).  *See DeForest Radio, Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927) ("Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license."); *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1582 (Fed. Cir. 1997) (finding implied license based on the patentee's "entire course of conduct," including its "efforts at [the Joint Electronic Device Council] to have its [technology] designated a standard"); *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) ("When warranted by such a course of conduct, the law implies a license.").

**2.      RIM Has Adequately Alleged That Motorola Has Breached Its FRAND Commitments.**

Although Motorola does not dispute that a FRAND contract exists, it argues that RIM has failed to adequately plead breach of the contract.  This argument is clearly contradicted by the Complaint.  RIM specifically alleges that Motorola has "refused to extend FRAND or RAND licensing terms to RIM for any of Motorola's purportedly essential patents . . . and has instead demanded of RIM terms that are unfair, unreasonable, and, on information and belief, discriminatory."  Compl., ¶ 83; *see also* ¶¶ 4, 39, 40, 88, 89 (App. 139, 149, 162).  Because Motorola does not dispute that the contract requires it to offer FRAND terms, Motorola Br. at 21, no more is required to plead breach.  *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App. 2000).  Motorola, at most, contests the factual predicate of RIM's allegations – that Motorola's demands were not FRAND – a factual matter for the jury to decide.[2]

**3.      RIM Has Been Injured By Motorola's Refusal To Provide A FRAND Royalty.**

Motorola also argues that RIM has failed to adequately allege injury because RIM "will receive a FRAND license – even if this Court has to determine the FRAND terms."  Motorola Br. at 20-21.  This argument ignores not only the explicit allegations of the Complaint (Compl., ¶ 166) (App. 177), but also the very real injuries RIM is suffering, and will continue to suffer, from Motorola's refusal to negotiate a FRAND rate.[3]

As an initial matter, the legal uncertainty created by Motorola's refusal to recognize the parties' license and to negotiate a FRAND rate has damaged RIM's reputation, product image,

---

[2]      Motorola also suggests that RIM has not adequately alleged a breach of the FRAND contract because it has not alleged that RIM sought and was refused a license solely to Motorola's purportedly essential patents.  This argument is a non-sequitor.  As Motorola concedes, during the parties' negotiations, it attributed a royalty rate to its purportedly essential patents.  Motorola Br. at 8.  RIM has alleged that this royalty rate was unfair, unreasonable, and discriminatory – *i.e.*, not FRAND.  Compl. ¶¶ 4, 39, 40, 83, 88, 89 (App. 139, 149, 162).  The fact that Motorola was also demanding exorbitant royalty rates for its non-essential patents does not change the fact that Motorola was in breach of its FRAND contracts.  Indeed, Motorola used the threat of its seeking an injunction on its non-essential patents as a coercive threat to seek non-FRAND royalties for its claimed essential patents.

[3]      RIM alleges that it "has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image."  Compl., ¶ 166 (App. 177).

and market goodwill.  In fact, several of RIM's customers have raised questions about the impact of this litigation.  *See, e.g.*, Declaration of Paul Holtz, May 12, 2008 ("Holtz Decl."), ¶¶ 2, 11 and Exhibit B, thereto (App. 62, 65, 67).  *See W.R. Grace & Co.-Conn. v. Taylor*, 2007 WL 1438544, at *1 n.4 (Tex. App. May 17, 2007) ( "loss of goodwill" and "clientele" constitute injury); *Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 753 (Tex. App. 2000) ("loss of goodwill" qualifies as injury); *see also Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1235 (E.D. Cal. 1999) (loss of business constitutes injury); *Avery Dennison Corp. v. Acco Brands, Inc.*, 2000 WL 986995, at *24 (C.D. Cal. Feb. 22, 2000) ("harm" caused to "customer relationships" demonstrates injury); *Axiom Advisers and Consultants, Inc. v. Sch. Innovations and Advocacy, Inc.*, 2006 WL 1049997, at *8 (E.D. Cal. Mar. 20, 2006) (loss of goodwill sufficient to state claim for damages).

Similarly, Motorola's breach has caused uncertainty with respect to RIM's costs which has made it difficult for RIM to price its products accurately, adversely impacting stakeholders and consumers in the downstream market for wireless communication devices.  *See* Holtz Decl., ¶¶ 6-10 (App. 63-65) (explaining difficulties and their impact).

In addition to these injuries, RIM also has incurred substantial legal fees and has been forced to devote significant internal resources to enforce the FRAND contract.  The parties' protracted royalty negotiations – needlessly extended because of Motorola's unreasonable royalty demands – have spanned nine months (from June 2007 until February 2008) and have diverted key RIM personnel from their core business responsibilities.  Mishler Decl., ¶¶ 12-13 (App. 4-5).  Furthermore, because RIM has been forced to resort to the courts to enforce Motorola's contractual obligations, it has incurred substantial attorney's fees, which will continue to accrue until Motorola complies with its contractual commitments.  *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 858 (1st Cir. 1985) (attorney's fees incurred in negotiating against defendants' bad faith demands constitute injury); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (attorney's fees incurred defending against bad faith assertion of patent constitute injury); *Estate of Arlitt v. Paterson*, 995 S.W.2d 713, 721 (Tex. App. 1999)

(allowing recovery of attorney's fees as actual damages), *overruled on other grounds by Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780 (Tex. 2006); *but see Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 232 S.W.3d 883, 897 (Tex. App. 2007).  These expenses are concrete and tangible injuries stemming directly from Motorola's breach of its contractual commitments.[4]

>    **4.    RIM Is Entitled To A Declaration That Motorola Has Breached Its FRAND Obligations.**

Even if the Court were to determine that RIM has not adequately pled any actual injuries (which it should not), RIM also has requested – and would be entitled to – a declaration that Motorola has breached its contractual obligation to provide a FRAND royalty rate.  *See* Compl., ¶¶ 186-193 (App. 180-182).  The very purpose of declaratory relief is to allow courts to hear "case[s] of actual controversy," 28 U.S.C. § 2201(a), so long as the controversy is "of sufficient immediacy and reality."  *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007) (quotation marks omitted).  RIM has adequately pled a future injury, which is "of sufficient immediacy and reality," to state a claim under the Declaratory Judgment Act.

>    **B.    RIM's Claim That Motorola Is In Breach Of The 2003 License Agreement Properly States A Cause Of Action.**

Motorola asks the Court to dismiss RIM's claim for breach of the parties' 2003 License Agreement on the ground that its agreement to engage in good faith negotiations towards an extension of the agreement is "unenforceable on its face."  Motorola Br. at 22.  It bases this argument, however, on a mischaracterization of the relevant provision, and a misreading of the applicable law.

---

4    Motorola correctly notes that the doctrine of promissory estoppel generally applies only in the absence of a valid contract.  *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) (promissory estoppel doctrine presumes no contract exists); *see also* 28 Am. Jur. 2d *Estoppel and Waiver* § 57 (2000).  To the extent Motorola concedes that its FRAND commitments create binding contractual obligations enforceable by RIM, RIM will withdraw its promissory estoppel claims.  If Motorola is unwilling to make this concession, RIM has adequately alleged a promissory estoppel claim:  Motorola's FRAND commitments are a clear promise, on which RIM reasonably relied to its detriment.  *See supra* § III(A)(3); *see also* Restatement (Second) of Contracts § 90(1) (1981); *Walker v. State Farm Lloyd's*, 2004 WL 1462200, *3 (N.D. Tex. Jun. 28, 2004) (promissory estoppel may be asserted by third party to promise).

As Motorola acknowledges, the 2003 License Agreement specifies that it is to be governed by Delaware law.  Motorola Br. at 22, n. 23.  Delaware law recognizes and enforces contractual provisions, like the one at issue here, to negotiate in good faith.  *See Gillenardo v. Connor Broad. Del. Co.*, 2002 WL 991110, at *7 (Del. Super. Ct. Apr. 30, 2002) (finding an "enforceable agreement as to the above-noted duties to negotiate in good faith"); *see also PharmAthene, Inc. v. SIGA Techs. Inc.*, 2008 WL 151855, at *116 (Del. Ch. Jan. 16, 2008); *B&P Holdings I, LLC v. Grand Sasso, Inc.*, 114 F. App'x 461, 466 n.6 (3d Cir. 2004); *The Liquor Exchange, Inc. v. Tsaganos*, 2004 WL 1254166, at *2 (Del. Ch. Jun. 2, 2004).

The Delaware cases that Motorola cites are not to the contrary.  Each of these cases involved either an agreement to agree in the future rather than a contractual provision requiring good faith negotiations, *Hammond & Taylor, Inc.  v. Duffy Tingue Co.*, 161 A.2d 238, 239 (Del. Ch. 1980) (finding a vague agreement "to cooperate" in the future unenforceable), or a dispute over whether a contract existed at all, *Int'l Equity Capital Growth Fund v. Clegg*, 1997 WL 208955, at *9 (Del. Ch. Apr. 22, 1997) (refusing to enforce an "agreement in principle"); *Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501, 503-504 (Del. Ch. 1958) (finding no contract existed because essential royalty term was too indefinite).  Motorola does not contest that the 2003 License Agreement is an enforceable contract.

Although Delaware law clearly controls, Texas courts will similarly enforce contractual provisions requiring good faith negotiations where, as here, the contract "defines or gives guidance" as to how the relevant contractual terms will be determined.  *See, e.g., Richter, S.A. v. Bank of Am. Nat'l Trust and Sav. Assoc.*, 939 F.2d 1176, 1196 (5th Cir. 1991) (applying Texas law and suggesting that where contract "defines or gives guidance" as to how terms will be determined, provision to negotiate in good faith towards those terms would be enforceable).  The 2003 License Agreement provides all material terms, and § 5.3 of the agreement requires the parties to negotiate any modifications to those terms in good faith.  2003 License Agreement, 13 (App. 79).  Furthermore, Motorola's FRAND obligations provide ample boundary for the royalty term, contrary to Motorola's assertions.  *See also John Wood Group USA, Inc. v. ICO, Inc.*, 26

S.W.3d 12, 21-22 (Tex. App. 2000) (citing *Richter* for the proposition that whether a good faith negotiation clause will be enforced depends upon whether a basis for defining the terms is evident from the contract).

### C.     RIM Has Pled Sufficient Facts To Establish That Motorola's Conduct Violated Section 2 Of The Sherman Act.

Motorola's intentional breach of its promise to license its patents on FRAND terms subverted standards-setting procedures that were in place for the very purpose of ensuring competition.[5]  Through its breach, Motorola abused these standards-setting processes to eliminate competition in technology markets and then to demand supracompetitive royalties from a competitor, RIM, that was outperforming Motorola in the marketplace.  In setting forth these allegations, the Complaint sufficiently pleads the two elements of RIM's monopolization claim:  (1) that Motorola "possessed monopoly power in the relevant market[s]" (in particular, the technology markets for the functionalities that Motorola's purportedly essential patents cover in the GSM, GPRS, UMTS and WLAN standards); and (2) that Motorola "willfully acqui[red] or maint[ained] that power" through "exclusionary conduct" rather than by "growth or development as a consequence of superior product, business acumen, or historic accident."  *See Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 315-17 (3d Cir. 2007) ("*Broadcom*") (holding allegations that Qualcomm made and broke FRAND commitments which had induced ETSI to standardize Qualcomm's proprietary technology stated a claim under Section 2).  Motorola's arguments for dismissing RIM's antitrust claim on both substantive and antitrust injury grounds are meritless.

---

5       *See, e.g.*, Compl., ¶ 55 (App. 154) ("ETSI's IPR policy was designed to benefit all ETSI members, as well as other parties who implement an ETSI standard.  In particular, the state objective of the policy, described in Clause 3.1, is to 'reduce the risk' to those implementing the standards or other technical specifications 'that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an essential IPR for a standard or technical specification being unavailable.'").

1.      **Motorola Possesses Monopoly Power In The Relevant Technology Markets.**

Motorola never explicitly challenges RIM's allegation that Motorola possesses monopoly power in the relevant antitrust markets.  Instead, it argues in a footnote that the "mere ownership of patents that happened to be listed as 'essential'" does not "*per se* bestow market power."  *See* Motorola Br. at 15, n. 18.[6]  Motorola confuses the issue and is wrong as a matter of law and logic.

Motorola erroneously relies on *Illinois Tool Works Inc. v Indep. Ink, Inc.*, 547 U.S. 28, 45-46 (2006), which stands for the uncontroversial proposition that not all patent holders are monopolists.  But that case says nothing about whether holders of ***essential*** patents (as Motorola purports to be) can obtain monopoly power by having their patented technology included in what become pervasive standards.  Motorola ignores this critical distinction.  RIM's Complaint alleges that it was the ***inclusion*** of Motorola's purportedly patented technology in the GSM, GPRS/EDGE, UMTS, and WLAN Standards – not Motorola's ownership of the patents themselves – that conferred monopoly power on Motorola.  Compl., ¶ 102 (App. 165) ("Now that the relevant standards have been released and industry participants have developed products based upon those standards, if Motorola's claim of ownership of essential patents is correct, Motorola possesses a monopoly in each of the relevant Mobile Wireless Technology Markets …").

The Third Circuit addressed this point in *Broadcom*, finding that the "value [of a patent]" before standardization (consistent with the Supreme Court's holding in *Independent Ink*) "is limited when alternative technologies exist."  501 F.3d at 314.  However, "[w]hen a patented technology is incorporated in a standard, adoption of the standard ***eliminates alternatives to the***

---

[6]      Motorola does not dispute the existence of the relevant technology markets alleged in the Complaint (*i.e.*, the GSM technology markets, the GPRS technology markets, the UMTS technology markets, and the WLAN technology markets).  *See, e.g.*, Compl., ¶ 181 (App. 179).  Nor could it.  Allegations describing technology markets such as the ones in this Complaint were sustained in Broadcom, 501 F.3d at 315 (upholding "markets for [Qualcomm's] WCDMA technology") as well as by other federal district courts.  *See, e.g., Hynix Semiconductor, Inc. v. Rambus Inc.*, 2008 WL 73689 at * 2 (N.D. Cal. Jan. 5, 2008) (recognizing propriety of defining technology markets in case concerning alleged abuse of standards-setting process).

*patented technology*."  *Id.* (emphasis added) (explaining that firms become "locked in" to a standard and thus must use the patented, incorporated technology).  Accordingly, Motorola's monopoly power flows from the elimination of technologies that had been competing to be incorporated into each of the relevant standards – not from the patent grant itself.  *Id.* (holding that complaint adequately pled monopoly power because, as a result of standardization, incorporated technology "was not interchangeable with or substitutable for other technologies").[7]

### 2.  Motorola's Breach Of Its FRAND Commitments Was Part Of A Deliberate Course Of Conduct That Subverted Competitive Standards-Setting Processes And Constitutes Exclusionary Conduct.

Motorola focuses almost exclusively on the second element of the monopolization claim, asserting that RIM has not adequately pled "anticompetitive" or exclusionary conduct.  *See* Motorola Br. at 15.  Its argument is two-fold.  Motorola first claims that RIM has failed to allege that it has breached any FRAND commitment.  *See id.* at 16.  For the reasons discussed above, *see supra* § III(A), this argument is not appropriate for resolution on a motion to dismiss. Motorola next argues that, even if Motorola breached FRAND commitments, merely reneging on FRAND commitments is not "exclusionary conduct" in violation of Section 2.  *See id.* at 17 & n. 20.  But Motorola ignores that its repudiation is not a garden-variety breach of contract, but rather part of a course of anticompetitive conduct that undermined and subverted the ETSI and IEEE standard-setting processes.  Motorola illegally excluded competition by first making FRAND commitments that (under ETSI and IEEE rules) were a precondition to having its patented technology included in the standards, and then opportunistically reneging on those commitments, thereby completing its monopolization of the relevant technology markets.  As

---

[7]    Motorola further argues, without citing authority, that, given the number of essential patent holders for any particular telecommunications standard, it cannot be that all possess monopoly power.  *See* Motorola Br. at 15, n. 18.  But that is akin to arguing that a single supplier of automobile tires cannot have monopoly power because other manufacturers make other car parts, *e.g.*, windshields, sparkplugs, and door handles.  That there are other essential technological components in each standard, and that those components may be covered by patents owned by others, is simply irrelevant to the issue of whether Motorola has monopoly power in a market that consists of technological components that Motorola claims read on its patents and those substitutes for those components that were available when the standards were adopted.  Indeed, the court in *Broadcom* held that the complaint adequately alleged monopoly power over the ETSI UMTS standard technology market at issue, notwithstanding that the defendant's essential technology represented "only a small component of the technologies that collectively comprise" the standard.  *Broadcom*, 501 F.3d at 315.

explained below, fundamental antitrust principles, Supreme Court precedent analyzing the intersection of antitrust law and SDO activities, and the only federal appellate court decision assessing the antitrust implications of a breach of a FRAND commitment all confirm that Motorola's conduct violates the Sherman Act.[8]

> ### (i) Motorola's Conduct Subverted ETSI And IEEE FRAND Safeguards And Is Therefore Exclusionary.

The Supreme Court has long recognized that subverting SDO procedures to inflict anticompetitive harm – as Motorola has done here – is "exclusionary conduct" that constitutes an antitrust violation. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510-11 (1988) (standards-setting participant can incur antitrust liability for "bias[ing] the process" with an "economic interest in restraining competition"); *see also Broadcom*, 501 F.3d at 310 ("conduct that undermines the procompetitive benefits of private standards setting" may be deemed an antitrust violation); *Rambus, Inc. v. Infineon Technologies AG*, 330 F. Supp. 2d 679, 698 (E.D. Va. 2004) ("[W]hen commandeered by a subset of industry players or, by obvious extension, a single industry player, conduct at an SDO may violate the antitrust laws.").

In *Allied Tube*, the Supreme Court recognized that standards development can offer "significant procompetitive advantages," but, when improperly subverted by participants, can function as a mechanism illegally to exclude competition: "[Standardization is] implicitly an agreement not to manufacture, distribute, or purchase certain types of products." 486 U.S. at 501. The Court held that SDO activities are permissible "only on the understanding that [they] will be conducted in a nonpartisan matter offering procompetitive benefits." *Id.* at 506-07.

---

[8]    The Fifth Circuit authority on which Motorola relies actually acknowledges that contract breaches may form the basis of an antitrust claim. *See Hayes v. Solomon*, 597 F.2d 958 (5th Cir. 1979) (cited in Motorola Br. at 17). Motorola, however, neglects to cite the statement in the opinion confirming that the court did "not mean to suggest that a state contract law dispute cannot also give rise to a federal antitrust claim." *Id.* at 973. Indeed, Motorola's argument with respect to exclusionary conduct, much like its assertions about monopoly power, are classic straw man arguments. RIM never asserts that a contract breach without more constitutes an antitrust violation, *see* Motorola Br. at 17, just as it never suggested that possession of a patent (without more) necessarily means the patent holder has monopoly power, *see id.* at 15, n. 18. Rather, as the Complaint demonstrates, it is Motorola's position as holder of purportedly essential patents and its breach of the FRAND commitments it made regarding those patents in the context of standards-setting activities at ETSI and IEEE that resulted in the exclusion of competitors and unlawful monopolization.

Thus, behavior that would otherwise constitute illegal exclusion under the antitrust laws may be permissible in the SDO context so long as the participants act in good faith; however, parties that "bias" the process to "stifl[e] … competition," face antitrust liability. *Id.* at 501, 506-07 (holding that vote-stacking scheme was subject to antitrust liability); *see also American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (affirming judgment against standards organization in which members "manipulate[ed]" standard to harm competitors); *Infineon*, 330 F. Supp.2d at 696 ("[E]ven if the [SDO] itself is not corrupt, the subversion of an [SDO] by a single industry player … can result in anticompetitive outcomes.").

In *Broadcom*, the Third Circuit applied *Allied Tube* to a case much like this one and held that allegations that an SDO participant (Qualcomm) breached its FRAND commitment stated a claim under Section 2 of the Sherman Act. *Broadcom*, 501 F.3d at 314. Like Motorola, Qualcomm was a member of ETSI during the development of the UMTS standard. *Id.* at 304. Qualcomm purportedly held patent rights covering Wideband CDMA ("WCDMA") technology. *Id.* ETSI, in reliance on Qualcomm's commitment to license its essential patents on FRAND terms, incorporated WCDMA into the UMTS standard. *Id.* After the standard was adopted, however, Qualcomm breached its commitment by demanding unfair, unreasonable, and discriminatory royalties from competitors in the downstream UMTS chipset market (and their customers). *Id.*

The Third Circuit recognized that FRAND commitments are vital safeguards that prevent a patent holder from abusing its ownership of intellectual property that it claims is essential to practicing the standard. *Id.* at 313 ("To guard against anticompetitive patent hold-up, most SDOs require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms.").[9] Moreover, FRAND commitments also serve as a "key indicator of the cost of implementing the potential technology" and are "an

---

9       The court in *Broadcom* cited an amicus brief submitted by IEEE (one of the SDOs at issue here) stating that "under IEEE bylaws, the absence of irrevocable FRAND assurances will preclude approval of standards known to incorporate essential, proprietary technologies." *See Broadcom*, 501 F.3d at 313.

important factor" when SDO participants choose among various alternative technologies. *Id.* Thus, the court concluded, because Broadcom alleged that Qualcomm undermined that FRAND safeguard, "obscur[ed] the costs" of its technology, and then reneged on the very conditions on which its monopoly power was conferred – it had alleged the type of SDO subversion the Supreme Court condemned in *Allied Tube*.[10]  *Id.* at 313-14.

Here, just as in *Broadcom*, RIM has alleged subversion of the standards development process through Motorola's undermining of the FRAND safeguard that protects against anticompetitive abuse.  In particular, the Complaint alleges that ETSI and IEEE members relied on Motorola's FRAND commitments in choosing to incorporate into the relevant standards technology over which Motorola claims patent rights instead of competing, alternative technologies.  Compl., ¶ 63 (App. 155) ("Motorola's FRAND declarations did induce ETSI into incorporating Motorola's patented technologies …"); *id.*, ¶¶ 74-75 (App. 158) ("In reliance on [Motorola's] letters of assurance [which included FRAND commitments] . . . IEEE released the 802.11 standard and various amendments … incorporating Motorola's … patented technology.") Compl., ¶¶ 51-55 (App. 153-154) (importance of FRAND in ETSI), *id.* ¶¶ 68-72 (App. 157-158) (importance of FRAND in IEEE).  Indeed, RIM specifically alleges that, under the ETSI and IEEE IPR policies, ***but for*** Motorola's commitment to license patents it claims are essential on FRAND terms, the SDOs would not have included Motorola's technology as part of the relevant standards.  *Id.*, ¶¶ 50, 72 (App. 152, 158).  Industry participants then relied upon Motorola's commitment in making the significant investments necessary to implement the relevant standards, investments that, in RIM's case, are now threatened by Motorola's breach.  *Id.*, ¶¶ 66, 79, 102 (App. 156, 159, 165).  Accordingly, by reneging on those FRAND commitments,

---

10      Similarly, in *Infineon*, the defendant was accused of, among other things, acquiring information during a standards-setting process for electrical devices and using that information to modify existing patent applications so that those patents would cover technology incorporated into the standard.  The defendant then approached those employing the standard with its patents and allegedly demanded excessive royalties.  The court denied the defendant's motion in limine to exclude evidence of this alleged scheme at trial, stating: "[a]ny sensible interpretation of [§ 2] would recognize that this conduct, if proven, is behavior violative of the monopoly law." *Infineon*, 330 F. Supp. 2d at 698.

Motorola has defeated the pro-competitive goals of the standards development process, and used the standard instead as an anticompetitive weapon unlawfully to monopolize the relevant technology markets, seek to extract monopoly royalties, and impair a successful rival in downstream product markets.

Finally, the recent decision in *Rambus Inc. v. Federal Trade Comm'n*, --- F.3d ---,  2008 WL 1795594 (D.C. Cir. Apr. 22, 2008), does not undermine the sufficiency of RIM's Section 2 allegations.  In that case, the District of Columbia Circuit reviewed the FTC decision that Rambus had unlawfully monopolized certain technology markets by, among other things, failing to disclose to an SDO that it held patent rights covering technology incorporated in a standard. *Id.* at *1.  The court set aside the Commission's order because, after a full administrative trial on the merits, the FTC had not found any causal link between the non-disclosure and the SDO's decision to incorporate Rambus' proprietary technology.  *Id.* at *5, 9.  That is, the FTC did not find that the SDO would not have incorporated Rambus' technology but for Rambus' nondisclosure.  *Id.*

The court in *Rambus*, however, never questioned the legal sufficiency of the allegations RIM makes here:  it expressly "assume[d] without deciding" that a non-disclosure in connection with standards setting that *is* proven to have caused harm to competition would support a monopolization claim.  *Id.* at *6.  Here, RIM is alleging precisely what the District of Columbia Circuit held that the FTC failed to find in *Rambus*:  that Motorola's subversion of the SDO processes caused harm to competition.  In particular, the Complaint alleges that *had* Motorola disclosed that it would not continue to license its claimed essential patents on FRAND terms after the standards to which they were allegedly essential became pervasive, the SDOs would not have incorporated its technology into the standards.  Indeed, the Complaint cites the ETSI and IEEE rules that specifically make clear that the SDOs will not incorporate technology into a standard if the holder of a patent reading on that technology refuses to provide an unqualified,

irrevocable FRAND commitment.[11]  Accordingly, they would not have incorporated into the standards at issue technology for which Motorola claims to own essential patents.  RIM's Complaint thus states a claim consistent with the holding in *Rambus*.

>    *(ii)*    ***RIM Need Not Allege Fraud to State a Section 2 Claim for Motorola's  Willful Violation of its FRAND Commitments.***

Motorola tries to escape liability by arguing it did not commit fraud in ***making*** its FRAND commitments.  But its footnote argument that reneging on FRAND promises violates the antitrust laws only when the FRAND commitment itself was "intentionally false" ***when made***, *see* Motorola Br. at 17, n. 20, reads into the law a requirement found nowhere in Section 2 jurisprudence or *Allied Tube*.  Furthermore, its argument reflects an overly narrow reading of *Broadcom*, and a misreading of the holding in *Hynix Semiconductor Inc. v. Rambus Inc.¸* 441 F. Supp. 2d 1066 (N.D. Cal. 2006), the only two cases Motorola cites for its surprising contention.

First, Motorola's attempt artificially to narrow the universe of conduct that violates the Sherman Act is at odds with fundamental Section 2 principles.  Although fraudulent conduct is one type of exclusionary conduct, it is not the only type.  Indeed, "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties." *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (quotations and citations omitted).  As the Fifth Circuit has recognized, "exclusionary conduct" is defined broadly to include obtaining or maintaining a monopoly by any means but competition on the merits; in other words, by means other than "superior product, business acumen, or historic accident." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999); *accord* III Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 651f, at 83-84 (2d ed. 2002).

Moreover, the very anticompetitive conduct the Supreme Court condemned in *Allied*

---

11    The Complaint references Section 8 of the ETSI IPR Policy which requires that the SDO suspend work on the relevant parts of the standard or revise the standard so as to make the IPR non-essential.  Compl., ¶ 54 (App. 154).  Similarly, the Complaint alleges that IEEE's policy is either to revise the standard to make the IPR non-essential or to discontinue work on the standard altogether.  *Id.*, ¶ 72 (App. 158).

*Tube* – manipulating the voting process in an SDO to keep a competitor's product from gaining necessary approvals – was not fraudulent. *Allied Tube*, 486 U.S. at 510-11. Nevertheless, the Court found that conduct violated the antitrust laws because it subverted the SDO process and excluded competitors through improper means; it did not limit the type of exclusionary conduct relating to SDOs that can be found to violate the antitrust laws, much less limit it to allegations of fraudulent conduct only.

To be sure, the court in *Broadcom* confined its holding to the facts of that case, which involved allegations of an "intentionally false promise" to license on FRAND terms coupled with a subsequent breach of that promise. *See* 501 F.3d at 314. Nevertheless, the rationale behind the *Broadcom* holding applies with equal force here. In this case, just as in *Broadcom*, the defendant's conduct "harm[ed] the competitive process" and conferred illegal monopoly power by circumventing FRAND commitments that were the condition on which the SDO incorporated the defendant's purportedly essential technology into industry standards. *Id.* Bad faith, opportunistic breaches of FRAND commitments after industry participants have become locked into standards, no less than FRAND commitments that were fraudulent when made, constitute illegal monopolization in violation of Section 2. In both cases, industry participants' reliance on the patent holder's undertaking to comply with its FRAND commitments leading to the exclusion of competing technologies by the SDO, yields the same result: technology markets in which a single supplier wrongfully attains monopoly power. Thus, Motorola's baseless attempt to distinguish *Broadcom* because it involved a FRAND commitment that was allegedly "intentionally false" when made is a distinction without a difference. Section 2 liability hinges on ***whether*** the defendant willfully subverted the outcome of an SDO process, not ***when*** it did so.

Finally, Motorola's reliance on *Hynix*, *see* Motorola Br. at 17, n. 20, is similarly misplaced. *Hynix* did not involve a breached FRAND commitment at all; rather, the defendant allegedly failed to disclose that it owned patents on technologies that were incorporated into the relevant standard. The court held that a mere violation of the SDO's disclosure policy – ***without more*** – would not violate the antitrust laws; it explained that liability instead turned on the

"circumstances and intent" behind its nondisclosure, *i.e.*, whether the nondisclosure was intentional. *Hynix*, 441 F. Supp. 2d at 1081. But the need to show ***intentional*** non-disclosure in the failure-to-disclose context was necessary to distinguish ***deliberate*** anticompetitive conduct (which Section 2 liability requires) from merely negligent conduct (which would not satisfy Section 2's willfulness requirement). *See Dimmitt Agri Industries, Inc. v. CPC Intern. Inc.*, 679 F.2d 516, 525 (5th Cir. 1982) (holding that monopolization requires "capacity and deliberateness"). Here, however, RIM has alleged a ***deliberate*** – not merely a negligent – course of conduct: RIM alleges that Motorola intentionally reneged on its FRAND commitment in a bad faith attempt to extract monopoly rents and injure a downstream rival. *See, e.g.,* Compl., ¶¶ 3-5 (App. 138-39). *Hynix* thus provides Motorola no safe harbor.[12]

For these reasons, RIM's allegations state a claim for monopolization under Section 2 of the Sherman Act.[13]

### 3.     RIM Has Pled Sufficient Facts To Establish Antitrust Standing.

Motorola has unlawfully excluded competing technologies from the relevant technology markets and is using its illegal monopoly to inflict anticompetitive harm on RIM, a consumer in the technology markets and a downstream rival in the sale of mobile wireless handsets and e-mail server technology. Despite this, Motorola claims RIM lacks antitrust standing to challenge Motorola's conduct because: (1) RIM has not yet paid excessive royalties to Motorola; and (2) RIM has not alleged that Motorola breached its FRAND commitments during licensing negotiations with other wireless phone manufacturers. *See* Motorola Br. at 11-15. Motorola ignores the injuries RIM ***has*** suffered and will continue to suffer, and that Motorola's conduct ***eliminated*** – let alone injured – competition in the relevant upstream technologies markets.

---

[12]     Because RIM's Section 2 claim does not depend on allegations of fraud, Motorola's argument that RIM has not pled fraud with specificity under Fed. R. Civ. P. 9(b), *see* Motorola Br. at 18-19, fails as well.

[13]     Motorola's argument that the antitrust claim is time barred, *see* Motorola Br. at 16, n. 19, again shows its misunderstanding of the allegations. In fact, the cause of action accrued when Motorola breached its FRAND commitment (in 2007 and 2008, *see supra* § II(E)), the act that caused RIM antitrust injury. *See Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988) ("The general rule in [the Fifth] Circuit is that an antitrust cause of action accrues each time a defendant commits an act that injures plaintiff.").

Accordingly, neither argument has merit.

RIM asserts claims for both treble damages under Section 4 of the Clayton Act and for injunctive relief under Section 16 of the Clayton Act. *See* 15 U.S.C. §§ 15(a), 26. Section 4 provides treble damages to those who suffer injury to their "business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977). Section 16 provides injunctive relief to anyone "threatened [with] loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986) (stating "§ 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage"). "Sections 4 and 16 are thus best understood as providing complementary remedies for a single set of injuries." *Id.* at 113. The injuries asserted under Section 4 and the threatened injuries asserted under Section 16 must be "antitrust injuries"; that is, they must be "the type [of injuries] the antitrust laws were intended to prevent and that flow[] from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489; *Cargill*, 479 U.S. at 113. An antitrust injury, thus, "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489. For the reasons discussed below, RIM's Complaint satisfies each of these requirements.

> ### (i)      RIM Has Alleged Injuries Sufficient To State A Claim For Damages And Injunctive Relief.

As an initial matter, Motorola's focus on whether RIM ***has already paid*** excessive royalties is misplaced. The ***mere threat*** of being forced to pay supracompetitive royalties is alone sufficient to establish standing to seek, at the very least, injunctive relief under Section 16 of the Clayton Act. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1988) (holding threat of paying supracompetitive price sufficient for standing to seek injunctive relief). Having pled facts sufficient to establish this threat, RIM has standing to pursue its Section 2 claim. *See* Compl., ¶ 192 (App. 182) (describing the coercion RIM faces to pay unfair and unreasonable royalties). Moreover, irrespective of whether RIM has or ever

will pay unfair, unreasonable, or discriminatory royalties to Motorola, RIM's Complaint pleads other injuries sufficient to establish standing both under Section 4 as well as under Section 16.

The uncertainty created by Motorola's refusal to recognize the FRAND license and to negotiate a FRAND rate, and the impact of this conduct on RIM's ability to anticipate its costs and price its products accurately, have caused and continues to cause considerable harm to RIM's business and goodwill.  *See* Holtz Decl., ¶¶ 6-11 (App. 63-65) (explaining impact); *see also* Compl., ¶ 184 (App. 180) (alleging loss of profits and goodwill); *supra* § III(A)(2). Moreover, as explained above, RIM has expended and continues to expend substantial internal resources and has incurred substantial attorneys' fees in its failed negotiations with Motorola for a FRAND license and defending against Motorola's anticompetitive conduct.  *See* Mishler Decl., ¶¶ 12-13, 15 (App. 4-5); *see also* Compl., ¶ 184 (App. 180).  Damages flowing from each of these injuries is recoverable under Section 4.  *See Red Lion Med. Safety, Inc.*, 63 F. Supp. 2d at 1235 (holding antitrust injury established by evidence of loss of business as a result of defendant's anticompetitive conduct); *Avery Dennison Corp.*, 2000 WL 986995, at *24 (antitrust injury established by "harm" caused to "customer relationships"); *Axiom Advisers*, 2006 WL 1049997, at *8 (alleged disruption of business relationships, loss of profits and goodwill sufficient for antitrust damages); *CVD*, 769 F.2d at 858 (attorneys' fees incurred in negotiating against bad faith demands that plaintiff license non-existent trade secrets); *Handgards*, 743 F.2d at 1297 (attorneys' fees incurred defending against bad faith assertion of patent).

RIM is also entitled to injunctive relief to prevent continued antitrust injury.  Motorola has effectively forced RIM to pick its poison, giving it two choices:  (1) pay unfair, unreasonable royalties; or (2) continue to suffer the injuries described above.  It is well-established that plaintiffs who are forced to choose among alternatives, each of which itself would create an injury, have standing.  *See CVD*, 769 F.2d at 858 (finding antitrust standing where "[i]n effect, … [defendant] gave [plaintiffs] three choices: (1) defend a trade secrets infringement suit against [defendant]; (2) refrain from competing with [defendant] …; or (3) take a license from [defendant] for the use of alleged trade secrets. All of the choices would have had an adverse

economic impact on the plaintiffs, as well as an anticompetitive effect."); *see also Dairy Foods Inc. v. Dairy Maid Products Coop.*, 297 F.2d 805, 808-09 (2d Cir. 1961) (same).  Indeed, Motorola itself has been accused of similar conduct in the past, and in that case the court explained that the threat caused injury.  *See Motorola, Inc. v. Kimball Int'l, Inc.*, 601 F. Supp. 63, 64-65 (N.D. Ill. 1984).  In *Kimball*, Motorola owned a patent and allegedly conspired with a competitor of the antitrust plaintiff to establish discriminatory royalty rates.  *Id.* at 62.  The court held that the plaintiff had standing because it was placed in a position of (a) paying the discriminatory royalty rates; (b) "ceas[ing] production with consequent loss in sales of the product"; or (c) incurring the burdens and expense of defending patent litigation.  *Id.* at 64-5.

### (ii)    RIM's Actual And Imminent Injuries Are Antitrust Injuries.

Motorola next asserts that RIM lacks standing for another reason, arguing that there has been no "injury to competition" because it "has dozens of licensees" to its purportedly essential patents in the downstream "wireless phone market," and therefore any injuries suffered by RIM could not be *antitrust* injuries.  Motorola Br. at 14-15 & n. 16.  Motorola mistakenly focuses on the so-called "wireless phone market," which is not the relevant antitrust market in this case (although, to be sure, RIM asserts that Motorola was motivated to injure RIM as a competitor in that downstream market).  *See supra* § III(C)(1).

The relevant markets in which the exclusionary effects of Motorola's conduct have been felt are the upstream technology markets in which RIM is a customer that has been denied a FRAND license.  RIM's Complaint is clear in its allegations:  Compl., ¶ 5 (App. 139) ("Motorola's unlawful conduct … **has had** a substantial anticompetitive effects **in the markets for the technologies that perform functions within various wireless communications standards**. …  Motorola's unlawful conduct, **if not constrained**, will also cause anticompetitive effects in the **downstream markets for standards-compliant products**.") (emphasis added); ¶ 94 (App. 163) ("Motorola's unlawful conduct has had a substantial anticompetitive effect on several distinct and well-defined Mobile Wireless **Technology Markets**.") (emphasis added); ¶ 108

(App. 166) ("Motorola's conduct has improperly foreclosed competition in the [technology markets…"]).  Motorola's misconduct not only injured competition in these technology markets, it completely eliminated competition.  *See supra* § III(C)(2).  Whether Motorola also has used its monopoly power in those markets more broadly to injure other competitors in downstream market for wireless phone products is simply ***irrelevant to the question of RIM's standing*** to claim injury for harm it has suffered as a consumer in the technology markets.[14]

Each of the losses RIM has suffered or is threatened with, *see supra*, "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *see Brunswick*, 429 U.S. at 489, and, accordingly, are antitrust injuries.  In short, each was inflicted or will be inflicted because Motorola's deliberate conduct excluded rival technologies and eliminated alternatives available to RIM.  By wrongfully attaining monopoly power in the relevant technology markets, Motorola has kept RIM from being able to obtain a license to Motorola's claimed essential patents on competitive terms.  If the SDOs had not incorporated technology over which Motorola claims patent rights, RIM would not be subject to demands for non-FRAND royalties for standards-essential technology and would have avoided the injuries complained of here.

## 4.    Motorola's Claim That RIM Has Not Pled Injury To Competition Or Its Own Injury With Adequate Specificity Is Without Merit.

Finally, Motorola claims that RIM has not pled injury to competition or its own injury with adequate specificity under *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  *See* Motorola Br. at 10, 12-13, 14.  Under *Twombly*, however, an antitrust complaint is not subject to heightened pleading requirements; it "does not need detailed factual allegations" so long as the factual allegations "raise a right to relief above the speculative level."  *Twombly*, 127 S. Ct. at

---

14    The fact that RIM and Motorola agreed on licensing terms for many of these purportedly essential patents in 2003, *see* Motorola Br. at 15, in no way undermines RIM's claims.  Indeed, Motorola's incentives have changed dramatically since 2003.  Motorola's recent, well-publicized struggles in the handset market, contrasted with RIM's rapid growth and sustained profitability, is one factor that has driven Motorola to use its purportedly essential patents as anticompetitive weapons, in violation of the intent of the licensing requirements contained in the ETSI and IEEE rules.  Another is Motorola's thus-far unsuccessful attempt to compete with RIM's successful enterprise e-mail service through its acquisition of Good Technology.  *See* Compl., ¶¶ 29-40 (App. 147-49).

1965, 1970 (holding that allegations of antitrust conspiracy must plead facts sufficient to make existence of conspiracy plausible). The Complaint easily satisfies this requirement. It sets forth allegations demonstrating concrete, non-speculative, and fully described injuries to competition and to RIM itself. No more is required at the pleading stage.

In terms of injury to competition, RIM makes specific allegations about Motorola's FRAND commitments, Compl., ¶¶ 59-66 (App. 155-56) (FRAND commitments at ETSI), ¶¶ 74-77 (App. 158-59) (letters of assurance at IEEE); the relevant SDO procedures, *id.*, ¶¶ 51-58 (App. 153-55) (ETSI's IPR policy), ¶¶ 68-72 (App. 157-58) (IEEE's IPR policy); how Motorola's FRAND commitments led to the incorporation of technology it claims to own into the standards and subsequent lock-in by those practicing the standards, *id.*, ¶¶ 62-63, 66 (App. 155, 156) (incorporation into GSM, GPRS, UMTS and lock-in by ETSI members and others practicing standard), ¶¶ 75, 79 (App. 158,159) (incorporating into 802.11 standard and lock-in by IEEE members and those practicing standard); and how that lock-in effectively eliminated competition in the technology markets, *id.*, ¶¶ 94-103, 108-109 (App. 163-65, 166-67).

In terms of injury specific to RIM, the Complaint specifically alleges how RIM relied on Motorola's FRAND commitments, *id.*, ¶ 66, 79 (App. 156, 159) (reliance on ETSI and IEEE commitments); how RIM became locked in to the relevant standards by investing tremendous resources, *id.*, ¶ 67 (App. 157) (investment in GSM, GPRS, UMTS standards compliance), ¶ 80 (App. 159) (investment in IEEE standards compliance), ¶¶ 81-82 (App. 159-60) (specific product line developed in compliance with standards); how Motorola's breach "left RIM unable to obtain – on fair, reasonable and non-discriminatory terms – licenses to practice technologies that Motorola claims are necessary to the continued manufacture and sale of many of its products," *id.*, ¶ 184 (App. 180); how "RIM has suffered injury to its business and property and is threatened by the imminent ***loss of profits***, ***loss of customers and potential customers***, and ***loss of goodwill*** and ***product image***," *id.* (emphasis added); and how, without injunctive relief, RIM will face "undue coercion and be forced to accept an unfair and anticompetitive license" to Motorola's purportedly essential patents, *id.*, ¶ 192 (App. 182).

In light of these and other allegations, Motorola's argument that RIM has not clearly provided Motorola notice of the allegedly unlawful conduct or resulting injuries to competition and to RIM is baseless.  *See Twombly*, 127 S. Ct. at 1964 (stating that Fed. R. Civ. P. 8(a)(2) requires "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests'") (citations omitted).

### D.    The Parties' Patent, Contract, and Antitrust Claims Should Remain Consolidated.

Motorola urges the Court not only to dismiss RIM's contract and antitrust claims, but also to break the case into multiple separate legal actions – by bifurcating RIM's contract and antitrust claims, and transferring RIM's declaratory claims based on Motorola's patents to the Eastern District of Texas.  The various claims between the parties, however, not only arise out of the same licensing dispute, but also will involve substantially overlapping technologies, closely related issues, and discovery concerning the same RIM and Motorola devices, and licensing programs.  It would be grossly inefficient to litigate these claims in multiple courts, and would almost certainly result in two courts addressing the same disputes.  As this Court and others have confirmed, judicial economy and efficiency can best be served by litigating these related claims together in the same forum.

Motorola ignores the substantial overlap between the claims, and raises the specter of an unmanageable trial.  But Motorola's arguments are all premised on a straw man.  There is simply no requirement that this Court try all of the claims at once in the same trial.  To the contrary, if the Court determines that a single trial would be unwieldy, the Court can maintain the claims in a single consolidated action for discovery and pre-trial purposes, but segregate them into separate, more limited trials.

### 1.    The Claims Substantially Overlap And Should Be Litigated In The Same Forum.

Although Motorola now accuses RIM of having "artificially bundled" what are really three separate lawsuits, it previously represented to this Court that there is "considerable

overlap" between the three actions pending between the parties in this Court, the Eastern District of Texas, and the District of Delaware.  *See* Motorola's Notice of Related Case and Motion to Consolidate, at 2, No. 08-CV-0284-G (filed Mar. 4, 2008).  As Motorola's earlier statement reflects, the parties are involved in a single licensing dispute which has manifested itself in a variety of patent, contract, and antitrust claims.  These claims are closely related and should be resolved in one forum in order "to prevent an extravagantly wasteful and useless duplication of the time and effort of the federal courts by the simultaneous trial of two complex and elaborate cases involving substantially the same factual issues."  *The Whistler Group, Inc. v. PNI Corp.*, 2003 WL 22939214, at *5 (N.D. Tex. Dec. 5, 2003) (Fish, C.J.) (internal quotations omitted).  This is particularly true given the complex nature of the parties' claims.  *Id.* ("[p]iecemeal litigation in the complex and technical area of patent . . . law is especially undesirable") (internal quotations omitted).

Indeed, if RIM had not raised all of the claims between the parties in this action, there would be strong grounds for consolidating them.  In *The Whistler Group*, for example, this Court transferred a patent dispute to another district where a case involving the same parties but a different patent was pending, noting that, because each case involved one of the parties' competing radar detectors, the cases would "involve overlapping core issues, common subject matter, and closely related questions."  *Id.* at * 5.  In doing so, the Court explicitly rejected the argument Motorola makes here – that transfer was not appropriate because the cases involved "'distinct patents that cover distinct technologies.'" *Id.* at *5, n.3.  As the Court confirmed, "that actions be identical or duplicative is not a prerequisite" to the benefits achieved from consolidating them in the same forum.  *Id.*

Similarly, in *Toshiba Corp. v. Hynix Semiconductor, Inc.*, 2005 WL 2415960 (N.D. Tex. Sept. 30, 2005), Judge Lindsay transferred Toshiba's patent infringement claims to the Northern District of California so that they could be tried with Toshiba's declaratory judgment claims pending there against the same party.  The Court rejected Toshiba's argument that transfer was not justified because the cases concerned "different patents that cover different technologies,"

concluding that, because the claims "involve[d] overlapping issues, similar subject matter and closely related questions," litigating them in "one place, before one court, would better serve the ends of efficient litigation and substantial justice." *Id.* at *6-7 (internal quotations omitted).[15]

The same considerations weigh strongly in favor of maintaining the parties' related patent, contract, and antitrust claims in a consolidated action in this Court. For example, both parties' patent infringement claims, as well as the contract and antitrust claims, involve the same RIM and Motorola devices. Mishler Decl., ¶ 16 (App. 5). RIM's BlackBerry® devices have been accused of infringing Motorola's patents – and are relevant to RIM's claim for damages based on its own patents. *Id.*, ¶¶ 17-18 (App. 6). Conversely, Motorola's Q and Q9 devices have been accused of infringing RIM's patents – and are relevant to Motorola's claim for damages based on its own patents. *Id.* (App. 6). The parties' BlackBerry®, Q, and Q9 devices are also at the center of RIM's contract and antitrust claims. *Id.*, ¶ 18 (App. 6). The same documents and many of the same witnesses accordingly will be relevant to all of the claims. *Id.*, ¶¶ 19-20 (App. 6-7). Moreover, the claims will "require an understanding of the same technological field and the same class of . . . devices," such that knowledge regarding one party's patents will create efficiencies in addressing the other claims. *Abbott Labs. v. Selfcare, Inc.*, 2000 U.S. Dist. LEXIS 15263, at *5 (D. Mass. Sept. 29, 2000) (denying motion to sever or bifurcate infringement counterclaims); *see also Digeo, Inc.*, 2007 WL 295539, at *5 (transferring antitrust claims to court where declaratory judgment patent claims pending appropriate because that court "will become familiar with the complex technological issues presented here"); Mishler

---

15      *See also Amberwave Systems Corp. v. Intel Corp.*, 2005 WL 2861476, at *2 (E.D. Tex. Nov. 1, 2005) (granting transfer motion in order to prevent "two complex and simultaneous actions between the same parties over related technologies and involving the same accused products"); *Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997 (E.D. Tex. 1993) ("[A]ll that need be present is that the two actions involve closely related questions or common subject matter, or that the core issues substantially overlap. The cases need not be identical to be duplicative."); *Digeo, Inc. v. Gemstar-TV Guide Int'l, Inc.*, 2007 WL 295539, at *5 (W.D. Wash. Jan. 29, 2007) (slip copy) (judicial economy favors transferring antitrust claims arising from parties' patent licensing negotiations for consolidation with infringement claims); *Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.*, 2003 WL 22213116, at *2 (D. Minn. Sept. 20, 2003) (denying severance and transfer of declaratory judgment claims where both sets of patents at issue "all cover the same device"); *In re Data Gen. Corp. Antitrust Litig.*, 510 F. Supp. 1220, 1226 (Jud. Pan. Mult. Lit. 1979) (determining that interests of efficiency would be best served "by placing the entire controversy before a single judge conversant with the complex computer technology underlying the claims in all actions and by fostering orderly pretrial proceedings on those common issues").

Decl., ¶ 17 (App. 6).

The parties' patent, contract, and antitrust claims also will involve overlapping competition and market issues. Competition within the downstream market for mobile wireless data products, and competition between RIM and Motorola specifically, will be relevant to assessing damages for all of the claims, including the patent claims. Competition within the relevant upstream technology markets for the functions Motorola claims are covered by its patents also will be relevant to evaluating the effects of Motorola's anticompetitive conduct. Again, the same documents, and many of the same witnesses, will be relevant to all of the claims. Mishler Decl., ¶¶ 19-20 (App. 6-7).

The parties' licenses and licensing programs is another area of substantial overlap. Motorola's licensing program is at the center of the contract and antitrust claims. Both parties' licenses also will be relevant to assessing damages for the patent infringement claims. Again, the same documents, and many of the same witnesses, will be relevant to all of the claims.[16] Mishler Decl., ¶¶ 19-20 (App. 6-7).

In short, the claims are sufficiently related that litigating them together in "one place, before one court, would better serve the ends of efficient litigation and substantial justice." *Toshiba Corp.*, 2005 WL 2415960, at *7 (internal quotations omitted).

## 2.    If The Court Ultimately Determines That A Single Trial Would Be Unwieldy, The Court Can Segregate The Claims For Trial Purposes.

Motorola makes no effort to dispute the efficiency of maintaining the parties' claims in a consolidated action for discovery and pretrial purposes. Instead, it focuses primarily on the

---

[16]    Given the demonstrated overlap between the party's infringement cases here, Motorola's attempt to draw a link to Judge Fitzwater's denial of RIM's motion to transfer in *Research In Motion Ltd. v. Visto Corp.*, 457 F. Supp.2d 708 (N.D. Tex 2006), is inapposite. RIM has provided a specific demonstration of the overlap between the cases and claims. Likewise, Motorola's reliance on *Research In Motion v. Visto Corp.*, No. 3:06-CV-0783-D, slip op. at 2 (N.D. Tex. July 11, 2006) (attached as Ex. J to the Declaration of Norman H. Beamer, submitted with Motorola's Motion to Dismiss), to contend that RIM's declaratory claims should be dismissed because they have been brought as compulsory counterclaims in the Eastern District is misplaced. As the court in that case explained, its decision not to hear the declaratory judgment claims was motivated by a concern for judicial efficiency based on the fact that the Marshall court was already "familiar with the patents-in-suit and the technology at issue and [had] conducted a claim construction hearing, decided preliminary injunction motions, and conducted a jury trial involving" two of the three patents that were the subject of RIM's declaratory judgment action. *Id.*

prospect of an "unmanageable" and "unwieldy" trial.  But it is not uncommon, in disputes of this magnitude, for courts to proceed with consolidated discovery and pretrial proceedings, and then to segregate the claims into logical groupings for trial.  *See, e.g., Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1392, Doc. No. 493 (S.D. Cal. Dec. 6, 2006) (amended trial scheduling order separating claims based on eleven patents into five groupings for trial, with parties alternating groupings) (App. 199); *Motorola, Inc. v. Analog Devices, Inc.*, No. 03-CV-131, Doc. No. 105 (E.D. Tex. Apr. 9, 2004) (Amended Scheduling Order) (App. 204).

Indeed, the federal multi-district litigation provisions recognize the efficiency of exactly such a process.  *See* 28 U.S.C. § 1407.  Cases designated for multi-district treatment are consolidated for discovery and pretrial proceedings in a single court in order to streamline pretrial proceedings, avoid conflicting rulings on similar questions, and promote judicial efficiency.  *Id.*  After discovery and pretrial proceedings have concluded, each case is then returned to its originating court for trial.  *Id.*  The same goals of efficient judicial administration that underpin that statute would be served by maintaining this consolidated case.

### 3. Separating The Claims For Discovery Purposes Would Complicate – Not Simplify – The Pretrial Process.

Although the Court may ultimately elect to segregate the parties' claims for trial purposes, separating the claims into multiple actions at this stage would considerably complicate the discovery and pretrial process, and would almost certainly result in two separate courts considering the same procedural and evidentiary issues.  *See In re Ephedra Prods. Liab. Litig.*, 314 F. Supp. 2d 1373, 1375 (Jud. Pan. Mult. Lit. 2004) (ordering consolidated pretrial proceedings for actions involving common factual questions where "[c]entralization . . . [was] necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary").

At the discovery phase, for example, disputes concerning matters such as the protective order, motions to compel discovery, motions to quash discovery, and third-party discovery would have to be decided by multiple courts, resulting not only in an inefficient use of judicial

resources, but also a very real risk of conflicting decisions.  Moreover, some of the same party and third-party witnesses would have to be deposed in both cases.  Similarly, as the claims approach trial, the same motions in limine and evidentiary issues also would have to be decided by multiple courts.  *See Seiko Epson Corp. v. Optoma Tech., Inc.*, 2007 WL 1793776, at *3 (N.D. Cal. June 19, 2007) (slip copy) ("parallel litigation in two different forums would create a serious risk of conflicting pretrial and trial schedules, not to mention inconsistent management of discovery limits and specialized patent litigation procedures").

Equally significant, separating the claims into separate actions could reduce the settlement pressure on the parties and complicate settlement negotiations.  *See Digeo, Inc.*, 2007 WL 295539, at *5 (increased likelihood of settlement through consolidation of related claims); *Foseco, Inc. v. Consol. Aluminum Corp.*, 851 F. Supp. 369, 371 (E.D. Mo. 1991) (by denying motion to stay damages discovery, court ensured that "parties will be fully prepared to negotiate a settlement if necessary").

E.    **The Court Should Not Dismiss Or Transfer RIM's Declaratory Judgment Claims Based On Motorola's Patents.**

Motorola's argument for transferring RIM's declaratory claims to the Eastern District of Texas ignores not only the efficiencies of litigating all of the claims together, but also the controlling Federal Circuit law, and Motorola's significant connections to this forum.  Indeed, Motorola offers only *one* argument for transferring the claims to the Eastern District of Texas – that it should be entitled, as the patent holder, to select the forum for resolution of its patent infringement claims.  As the Federal Circuit and this Court have both confirmed, however, a patent holder's choice of forum is entitled to little weight where, as here, the patent holder selects a forum with *no connection* to the parties or the dispute.  Indeed, although Motorola accuses RIM of "forum shopping," Motorola's own gamesmanship is evident from its decision to file its claims based on its own patents in the Eastern District of Texas, but to file its declaratory claims based on RIM's patents in the District of Delaware.

As the Federal Circuit confirmed three months ago in *Micron Technology, Inc. v.*

*MOSAID Technologies, Inc.* – a case Motorola fails even to acknowledge in its brief – the primary factors to be considered in deciding a motion to transfer patent claims are the convenience and suitability of the competing forums.  Motorola does not – and ***cannot*** – dispute that this Court has a significantly greater connection to the parties and the claims, and is a more convenient and suitable forum.[17]

### 1.    The Federal Circuit Has Confirmed That The Primary Factors To Be Considered Are The Convenience And Suitability Of The Competing Forums.

The primary problem with Motorola's argument for transferring RIM's declaratory claims to the Eastern District of Texas is that it ignores the controlling Federal Circuit law. There can be no question that Federal Circuit law applies to this issue.[18]

In *Micron Technology, Inc. v. MOSAID Technologies, Inc.*, the Federal Circuit confirmed that the "'considerations affecting transfer to or dismissal in favor of another forum do not change simply because the first-filed action is a declaratory action,'" and that the primary factors to be considered are the "convenience and suitability of [the] competing forums."  518 F.3d 897, 904 (Fed. Cir. 2008) (*quoting Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993)).  The court went on to reject exactly the argument that Motorola makes here – concluding that the Northern District of California should ***not*** have dismissed a declaratory judgment action, filed the day before the patent holder's infringement action on the same patents, because the Northern District of California was the "more appropriate" forum and "more convenient" for both parties.  *Id.* at 905.  The court focused, in particular, on the fact that the party ***resisting*** litigating in California had significant operations there.  *Id.*; *see also Genentech*, 998 F.2d at 938

---

17        This Court has jurisdiction over RIM's declaratory claims.  There is an actual and immediate controversy between the parties, as evidenced by Motorola's later-filed suit in the Eastern District of Texas regarding the same patents.  *See MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007); *see also* 28 U.S.C. § 2201.

18        The Federal Circuit has repeatedly held that because the "question whether to accept or decline jurisdiction in an action for a declaration of patent rights in view of a later-filed suit for patent infringement impacts [the Federal Circuit's] mandate to promote national uniformity in patent practice," it falls within that court's "exclusive subject matter jurisdiction."  *Electronics For Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1345-46 (Fed. Cir. 2005); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), overruled in part on other grounds by *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995) (same).  As a result, the Federal Circuit's decisions are controlling in this area. *Electronics For Imaging*, 394 F.3d at 1345-46; *Genentech*, 998 F.2d at 937.

(reversing district court's dismissal of declaratory judgment action in favor of infringement action where there were "sound reasons" for the declaratory plaintiff's choice of forum).

In this case, as in *Micron*, Motorola has no basis for resisting litigation of its claims in a forum where it has substantial operations.

### 2.    The Northern District Of Texas Is The More Appropriate Forum For The Claims.

#### (i)    *Both Parties Have Significant Connections With The Northern District, But No Connections With The Eastern District.*

Motorola has not – and ***cannot*** – dispute that the Northern District of Texas is the more convenient and suitable forum for the parties' dispute. Both parties have significant operations in this district, and neither has any operations in the Eastern District of Texas.

RIM Corporation, the U.S. subsidiary of RIM Limited and a party to each of Motorola's actions, has its principal offices in Irving, located in the Northern District, at which it employs approximately 230 employees. Mishler Decl., ¶¶ 1, 21-22 (App. 7). RIM's Irving facility includes substantially all of RIM's U.S.-based licensing and standards employees. *Id.*, ¶ 24 (App. 8). These employees, and their documents, will be central not only to the antitrust and contract claims, but also to the damages issues for the patent claims. *Id.* (App. 8]). In addition, the Irving facility's employees perform a variety of other functions, including development and recruiting, mechanical engineering, IT, hardware engineering, software development, manufacturing, and customer service. *Id.*, ¶ 22 (App. 7). Further, RIM's BlackBerry® devices are configured, packaged, and distributed from a facility in Carrollton, Texas, located in the Northern District of Texas, which has shipped over 10 million units. *Id.*, ¶ 23 (App. 7).

Motorola also has significant operations in the Northern District. Motorola employs over 1,000 people in Fort Worth, Texas, where it manufactures semiconductors and communication devices. *Id.*, ¶ 26 (App. 8). In fact, it appears that Motorola's North American center for assembling, packaging, and distributing cell phones is based in Fort Worth. *Id.*, ¶ 27 (App. 8). A recent regulatory filing on Motorola's behalf indicates that Motorola utilizes facilities for cell

phone processing in Fort Worth that employ, between Motorola's employees and those of affiliates and third-party contractors, 3,800 people and are capable of processing up to 50 to 60 million cellular telephones annually.[19] *Id.*, ¶ 26 (App. 8). Indeed, six of the named inventors on Motorola's asserted patents were based in the Northern District when they filed their patent applications: Mr. Gregory Lewis Cannon (Keller), Mr. David P. Kilp (Colleyville), and Mr. Nick P. Lagen (Forth Worth), the named inventors of the '447 Patent; and Mr. John D. Deletic (Dallas), Mr. Vick T. Cox (Plano), and Mr. John A. Davis (Plano), the named inventors of the '211 Patent. *Id.*, ¶ 27 (App. 8).

Motorola attempts to brush these significant facts aside by noting that RIM and Motorola are both large companies with operations spanning the world and employees who travel frequently. Motorola Br. at 38-39. All that is true, but there remains no good reason to disturb RIM's choice of venue and to transfer its claims from a district where each of the parties is present to one with which they have no connections. *See Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 679 (E.D. Tex. 2001) (where no parties present in plaintiff's chosen forum, and "where there is no factual nexus" to that district, case "far more properly" belongs in district where many of the parties are located and material events occurred).

### (ii)    RIM's Action In This District Was The First-Filed Action.

RIM's declaratory claims were not only filed in a forum with a real connection to the parties and their dispute, they also were the first-filed claims addressing Motorola's patents. Motorola concedes that RIM filed its Complaint in this district before Motorola filed its action in the Eastern District of Texas. Motorola Br. at 32. It also concedes that the "general rule" favors the forum of the first-filed action, whether or not it is a declaratory judgment action. Motorola Br. at 30 (*citing Genentech*, 998 F.2d at 937); *see also Micron Technology*, 518 F.3d at 904;

---

[19]    Motorola claims in its opposition brief to RIM's transfer motion in the Eastern District of Texas that there are "less than a dozen employees from the Mobile Device business unit at Motorola's Dallas facilities," Motorola Opposition to RIM's Motion to Transfer Venue to the United States District Court for the Northern District of Texas, No. 2:08-69 (E.D. Tex.), April 30, 2008, at 4, but this figure plainly understates the full extent of Motorola's cellular phone operations in the Northern District.

*Kerotest Mfg. Co. v. C-O-Two Fire Equip Co.*, 342 U.S. 180, 185 (1952).

Motorola contends that the "first-filed" rule should not apply here because the parties' complaints were filed close in time.  However, courts have applied the "first-filed" rule even in these circumstances.  *See, e.g., Genentech, Inc.*, 998 F.2d at 938 ("first-filed" rule is "supported by reasons just as valid when applied to the situation where one suit precedes the other by a day as they are in a case where a year intervenes between the suits.") (internal quotations omitted); *Sabre, Inc. v. Northwest Airlines, Inc.*, 2004 WL 2533867, at *3 (N.D. Tex. Nov. 8, 2004) (where first complaint filed after hours in clerk's drop box and second complaint filed at 8:23 a.m. the next morning, "a clear distinction between the filing dates can still be made"); *Eastman Med. Prods., Inc. v. E.R. Squibb & Sons, Inc.*, 199 F. Supp. 2d 590, 595 (N.D. Tex. 2002) ("The case law does not support [the] view" that where cases are filed "'almost simultaneously,' the 'first to file' rule is less important").  This factor accordingly provides further support for maintaining jurisdiction in this Court.

### (iii)    Proceeding With RIM's Declaratory Claims In This District Will Promote The Convenience Of The Parties And the Witnesses, And The Interest Of Justice.

As the Federal Circuit confirmed in *Micron*, the Court should consider the "convenience factors" under 28 U.S.C. § 1404(a) in assessing the suitability of the competing forums.  *Micron*, 518 F.3d at 904.  Despite "bear[ing] the burden of proving by a preponderance of the evidence that transfer is appropriate" by making a "particularized showing . . . including identification of key witnesses and the general content of their testimony," *Bank One, N.A. v. Euro-Alamo Investments, Inc.*, 211 F. Supp. 2d 808, 812 (N.D. Tex. 2002), Motorola does not even attempt to show that the Eastern District of Texas is a more convenient forum, or that it has a greater connection to the case.  Motorola Br. at 38, 39.  In fact, the convenience factors, like the other relevant considerations, weigh strongly in favor of maintaining all of the claims, including the declaratory claims, in this district.

a)    *The Relative Ease Of Access To Sources Of Proof Supports Adjudicating RIM's Declaratory Patent Claims In The Northern District.*

"The convenience of the witnesses is often regarded as the most important factor to be considered in deciding whether to transfer venue" with "the convenience of non-party witnesses . . . accorded the greatest weight." *The Whistler Group*, 2003 WL 22939214, at *3 (citations omitted).

Motorola does not – and cannot – argue that litigating RIM's declaratory patent claims in the Eastern District of Texas would benefit any witnesses, or that any evidence is located in that district.  In contrast, relevant documents and witnesses are located in the Northern District of Texas.  As referenced above, six of the inventors named in the asserted Motorola patents were located in the Northern District of Texas at the time they applied for their patents.  Motorola acknowledges that two of these inventors still reside in the Dallas area.  Motorola Br. at 40.  It will plainly be more convenient and less costly for these witnesses to testify in Dallas than to travel some 160 miles to Marshall.  *See Spiegelberg v. Collegiate Licensing Co.*, 402 F. Supp. 2d 786, 791 (S.D. Tex. 2005) (presence of two nonparty witnesses along with the plaintiff in the Northern District sufficient to "strongly favor[] transfer" from the Southern District).  Moreover, regardless of the current location of the other inventors, discoverable information regarding the work that led to the patents likely remains in this District.  Mishler Decl., ¶ 27 (App. 8).

RIM's licensing and technology standardizations employees, located in Irving, also will have highly relevant information and documents relating not only to RIM's contract and antitrust claims, but also to the damages issues relevant to both parties' patent infringement claims.  *Id.*, ¶ 24 (App. 8).  *See also, e.g., In re: Horseshoe Entertainment*, 337 F.3d 429, 434 (5th Cir. 2003) (district court "erred in not giving significance" to location of physical records).

A trial in this District also will be more convenient for the third-party witnesses who live out of state and will have to fly to Texas.  Traveling to Dallas will be less time consuming and expensive than traveling to Marshall (most likely by way of the regional airport in Shreveport, Louisiana) because the Dallas/Fort Worth International Airport offers more direct flights.  *In re:*

*Volkswagen AG*, 371 F.3d 201, 205 n.3 (5th Cir. 2004) (absence of direct flights to Shreveport airport "require[es] passengers to make a stop either in Dallas/Fort Worth or Houston" on their way to Marshall); *Yett v. Peters*, 2008 WL 177873, at *3 (E.D. Tex. Jan. 18, 2008) (recognizing presence of airport near Forth Worth as a factor favoring transfer from Sherman).

### b) The Convenience Of The Parties Favors Litigating In The Northern District of Texas.

Motorola contends that it will be equally convenient for the parties to litigate in Marshall or in Dallas. Motorola Br. at 38. But a court will consider the "common-sense conclusion" that "it would be more convenient and economical for . . . corporations to litigate [a] matter in their home district" than elsewhere. *Minka Lighting, Inc. v. Trans Globe Imports, Inc.*, 2003 WL 21251684, at *2 (N.D. Tex. May 23, 2003) (Fish, C.J.); *see also Micron Technology*, 518 F.3d at 905. ("[w]ith an eye to the convenience factors," concluding that district court abused its discretion by declining to exercise jurisdiction over declaratory action where foreign corporation had its U.S. operations in that court's district).

Here, requiring RIM employees to travel 160 miles to Marshall will increase the expense and inconvenience of the litigation.[20] Mishler Decl., ¶¶ 29-31 (App. 9); *see also In re: Volkswagen AG*, 371 F.3d at 204-05 (identifying 100 miles as the distance past which "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled"); *see also Spiegelberg*, 402 F. Supp. 2d at 791 (plaintiff's ability to "save travel expenses" by proceeding in home district favors transfer); *Green v. Burlington N. & Santa Fe Railway Co.*, 2006 WL 154329, at *3 (N.D. Tex. Jan. 19, 2006) (granting transfer from Dallas to Fort Worth Division because parties and witnesses "would incur less travel time and expense").

---

[20]    Motorola is at best disingenuous when it claims that RIM cannot contend that litigating in the Eastern District would be inconvenient because RIM filed a motion to transfer claims there in a case it litigated against Visto. Motorola Br. at 38. Motorola omits the fact that RIM's motion to transfer in that case came only after its declaratory judgment claims were dismissed in favor of the Eastern District. As the court noted, RIM filed its transfer motion "so that all the claims between the parties will be consolidated in one case." *Research In Motion Ltd. v. Visto Corp.*, 2007 WL 1452092, at *1 (N.D. Tex. May 17, 2007) (slip copy).

**c)** ***The Local Interest In Adjudicating Local Disputes Favors Keeping RIM's Declaratory Patent Claims In The Northern District.***

Motorola makes no claim that the Eastern District of Texas has a stronger local interest in RIM's declaratory patent claims than this district, nor could it given the absence of any substantial connections between the Eastern District and the parties or RIM's claims. Instead, Motorola contends that the two districts have an "equal nexus and interest" in RIM's claims merely because they are both locations where alleged acts of infringement occurred. Motorola Br. at 39. But these alleged acts of infringement are not a sufficient basis for determining a forum when another forum has closer connections to the parties and the dispute. *See Bose Corp. v. Sunshine Electronics of N.Y., Inc.*, 2006 WL 1027684, at *6 (N.D. Tex. April 12, 2006) (slip copy) (advertising and sales of plaintiff's products in the Northern District not "sufficiently distinguishable from [similar acts] committed in any other District" to prevent transfer to forum with meaningful connections).

The Northern District of Texas is much closer to the center of gravity in this case and has a stronger local interest in it than the Eastern District of Texas because the dispute between the parties arose during licensing negotiations here and because both parties are present here. Mishler Decl., ¶¶ 11, 21-26 (App. 4, 7-8). This factor accordingly weighs strongly against transferring the claims to the Eastern District of Texas. *See, e.g., Empty Barge Lines II, Inc. v. Dredge Leonard Fisher*, 441 F. Supp. 2d 786, 799 (E.D. Tex. 2006) (transferring case where "none of the parties are located in the Eastern District of Texas, and the incident giving rise to this action occurred in the Southern District of Texas, where all the parties are located"; transfer "would unburden a community with no strong local interest" in the dispute); *Precis, Inc. v. Fed. Ins. Co.*, 2005 U.S. Dist. LEXIS 12678, at *5 (N.D. Tex. June 27, 2005) (Fish, C.J.) (transferring case *sua sponte* to the Fort Worth Division because it had "no apparent connection" to the Dallas Division); *Ins. Co. of the West v. Fort Worth Indep. Sch. Dist.*, 2005 WL 3453959, at *2 (N.D. Tex. Dec. 15, 2005) (transferring case to the Fort Worth Division where "Plaintiff has not presented any evidence that connects this case to the Dallas Division"); *Kumar v. Hyundai*

*Semiconductors, Inc.*, 1999 WL 202543, at *4 (N.D. Tex. March 31, 1999) ("Because this community bears no relation to the events giving rise to this lawsuit, there is no reason to burden the citizens of Dallas with serving as jurors in this case.").

### 3.    Proceeding With RIM's Declaratory Claims In This District Will Avoid Piecemeal Litigation.

As explained more fully above, *see supra* § III(D), resolving all of the claims between the parties in one forum will result in considerable efficiencies and savings in both judicial resources and client costs.  As this Court stated in *The Whistler Group*:  "Litigation of all issues arising under [the parties'] patents in one place, before one court, would better serve the ends of efficient litigation and substantial justice."  2003 WL 22939214, at *7; *see also Aventis Pharms. Inc. v. Teva Pharms. USA Inc.*, 2007 WL 2823296, at *2 (E.D. Tex. Sept. 27, 2007) (slip copy).

### 4.    Motorola's Choice Of Forum Is Not Entitled To Undue Deference, Particularly Where, As Here, Motorola Has Chosen A Forum With No Connection To The Parties Or The Evidence.

Motorola's only real argument for transferring its patent claims to the Eastern District of Texas is that it should be entitled, as the patent holder, to select the forum for resolution of its claims.  Although a plaintiff's choice of forum is generally afforded some degree of deference in evaluating a motion to transfer, it deserves no more weight than the other public and private factors, and is never dispositive.  *In re: Horseshoe Entertainment*, 337 F.3d at 434 ("[T]he plaintiff's choice of forum is clearly a factor to be considered but in and or itself it is neither conclusive nor determinative").  Indeed, the Federal Circuit has consistently rejected application of this presumption in patent cases, first in *Genentech* and, more recently, in *Micron Technology*. As the court explained in *Genentech*, "[s]uch a rule would automatically grant the patentee the choice of forum" and is, therefore, "contrary to the purpose of the Declaratory Judgment Act to enable a person caught in controversy to obtain resolution of th dispute[.]"  998 F.2d at 937; *see also Micron Techology*, 518 F.3d at 902; *Amberwave Systems Corp. v. Intel Corp.*, 2005 WL 2861476, at *2 (E.D. Tex. Nov. 1, 2005) (transferring patent infringement action to forum of

first-filed declaratory judgment action).[21]

Moreover, a patent holder's choice of forum is entitled to even less weight where, as here, it brings suit outside of its home district and in a district with minimal connections to the action. *Whistler Group*, 2003 WL 22939214, at *2 ("plaintiff's choice of forum has reduced significance where most of the operative facts occurred outside the district" and "when the plaintiff brings suit outside its home district"). In *Minka Lighting*, for example, this Court denied the plaintiff's efforts to litigate in a forum outside its home district and lacking connections to the dispute, finding that the other factors under the § 1404(a) analysis outweighed the plaintiff's preference. 2003 WL 21251684, at *4.

In the present case, Motorola has not only brought suit outside of its home district, it has intentionally bypassed an adjacent district with a substantial stake in the litigation. Motorola's arbitrary choice of forum is entitled to little to ***no*** value, especially in light of the private and public factors described above.

Motorola's related argument that "fairness" demands dismissal of RIM's declaratory judgment claims because RIM filed them in this district as a means of improper forum shopping is equally without merit. Motorola Br. at 36-37.[22] Motorola's accusations of forum shopping ring particularly hollow given the parties' respective choices of forum. RIM filed a comprehensive action aimed at resolving all of the related disputes between the parties in a district where both parties have significant operations. Motorola, in contrast, chose to split its

---

21    Motorola focuses, in particular, on this Court's decision in *Mill Creek Press, Inc. v. Thomas Kinkade Co.*, concluding that a declaratory judgment action should give way to a later filed action by the owner of the relevant copyright and trademark. 2004 WL 2607987 (N.D. Tex. Nov. 16, 2004) (Fish, C.J.). The Federal Circuit has since held in *Micron Technology*, however, that a court faced with such a jurisdictional decision "should not reach a decision based on any categorical rules," and that "the convenience and suitability of [the] competing forums" – rather than the preferences of the parties – should control. 519 F.3d at 904.

22    Motorola's reliance on *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) and *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996), to support its argument that RIM improperly anticipated Motorola's suit is misplaced. As the Federal Circuit explained in *Micron Technology*, the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007), overruled the Federal Circuit's "reasonable threat of imminent suit test" – utilized in both *BP Chemicals* and *EMC Corp.* – and adopted a more lenient standard, thereby creating a "greater likelihood of jurisdiction for declaratory judgment filers." *Micron Technology*, 518 F.3d at 900-01, 904.

---

patent claims, filing its defensive claims in the District of Delaware and its offensive claims in the Eastern District of Texas, a district that has no material connection to this controversy or to the parties.  If any party has engaged in improper forum shopping, it is Motorola.[23]

### F.    The Court Should Not Stay RIM's Contract And Antitrust Claims.

Motorola asks the Court not only to transfer RIM's declaratory patent claims, but also to bifurcate and stay its contract and antitrust claims.  Motorola claims, in support of this argument, that courts "routinely" bifurcate and stay antitrust and other non-patent claims pending resolution of patent claims.  Motorola Br. at 25.

The cases Motorola relies on, however, are not even remotely similar to this case.  All involve "sham litigation" claims that were ***contingent*** on the outcome of the underlying patent claims – in which the party sued for patent infringement alleged that the patent was invalid or unenforceable, and that the patent holder acted fraudulently either in obtaining the patent from the Patent Office, or in asserting it in the litigation.  In these "sham litigation" cases, the antitrust counterclaims are wholly contingent on the patent claims:  if the patent holder prevails in the infringement action, the antitrust counterclaims become moot.  Some courts accordingly have stayed these counterclaims, reasoning that they might never reach them.  *See, e.g., In re Innotron Diagnostics*, 800 F. 2d 1077, 1084 (Fed. Cir. 1986) (staying "potentially moot antitrust issues"); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 234 (D. Del. 1984) (noting that outcome of patent trial may lead to dismissal of other claims); *Affymetrix, Inc. v. PE Corp. (N.Y.)*, 219 F. Supp.2d 390, 398 (S.D.N.Y. 2002) ("In this case, defendants argue that because a finding that the . . . patents are valid and enforceable would render moot plaintiff's antitrust

---

23    Even if the Court were to conclude that RIM had engaged in forum shopping by filing its declaratory judgment patent claims in this district – which it plainly should not – that "consideration is merely one factor in the analysis" of whether to dismiss those claims.  *Micron Technology*, 518 F.3d at 904; *see also Electronics For Imaging*, 394 F.3d at 1348 (district court abused its discretion in dismissing a declaratory judgment action solely on the grounds of its "alleged anticipatory nature").

claims, the patent validity and enforceability issues should be resolved first.").[24]

In this case, in contrast, RIM's contract and antitrust claims are ***not*** contingent on the patent claims, and will require resolution regardless of the outcome of those claims. As at least one other court has confirmed, contract claims like those at issue here – based on a party's FRAND commitment to a standard-setting organization – should actually be tried ***before*** the related patents. In *Ericsson Inc. v. Samsung Elecs. Co.*, 2007 WL 1202728 (E.D. Tex. Apr. 20, 2007), Samsung and Ericsson filed a large number of patent claims against each other. Each of the parties also claimed that the other had breached its FRAND commitment to ETSI by failing to offer fair, reasonable, and non-discriminatory licensing terms. The court concluded that the FRAND contract issues were separable, and that they should be tried ***before*** the related patent claims, reasoning that "resolution of the FRAND case might alleviate many of the primary differences between these two parties." *Id.* at *3.

In this case, as in the *Ericsson* case, it would make no sense to bifurcate and stay RIM's contract and antitrust claims. These claims are not only at the center of the parties' dispute, but also will require resolution regardless of the outcome of the patent claims.

### G.  If The Court Decides To Segregate the Claims for Separate Trials, The Court Should Order An Early Trial On The FRAND Contract Claim.

For all of the reasons discussed *supra*, § III(D), separating the parties' claims for discovery and pretrial purposes would complicate, not simplify, the resolution of this dispute. The claims should remain consolidated in this Court – where the parties have significant ongoing operations, where relevant witnesses and documents are located, and where the underlying

---

24    *See also Chip-Mender, Inc. v. Sherwin-Williams Co.*, 2006 WL 13058, at *13 (N.D.Cal. Jan. 3, 2006) ("Resolution of the invalidity issue . . . may dispose of the antitrust counterclaims altogether."); *ASM Am. Inc. v. Genus, Inc.*, 2002 WL 24444, at *6 (N.D. Cal. Jan. 9, 2002) ("As [defendant] itself recognizes, its sham litigation and fraudulent procurement theories fail if the patents are not invalidated."); *Baxter Int'l Inc. v. Cobe Lab. Inc.*, 1992 WL 77665, at *1 (N.D. Ill. 1992) (antitrust counterclaims "could be rendered moot by the decisions on the patent issues").

The remaining cases cited in Motorola's brief also involved situations where pretrial proceedings were bifurcated in order to expedite preliminary determinations likely to moot or substantially simplify contingent issues. Here, however, although the patent and antitrust claims are factually interrelated (and thus should remain consolidated for discovery), they are legally independent from the patent claims.

license negotiations that prompted the various actions between the parties took place.

If this Court elects to segregate the claims for trial purposes, the most logical candidate for an early trial is RIM's claim for breach of the FRAND contract. Motorola does not dispute that a contract exists, and that it is required to offer a FRAND royalty rate for the patents it claims are essential to the ETSI and IEEE wireless technology standards. Motorola Br. at 20-21. Accordingly, the **only issue** requiring judicial resolution is the appropriate FRAND royalty rate.

As referenced above, the *Ericsson* court recently ordered just such a trial, reasoning that resolving the FRAND issue first "might alleviate many of the primary difference between these two parties." *See Ericsson*, 2007 WL 1202728, at *3. The court never reached the issue, as the entire matter settled within three months of this order granting an early trial on the FRAND royalty rate. *Ericsson Inc. v. Samsung Elecs. Co.*, No. 06-CV-63, Doc. No. 81 (E.D. Tex. Jul. 11, 2007) (Joint Motion to Dismiss Without Prejudice) (App. 214).

Despite Motorola's dire predictions of the complexity of determining a FRAND royalty rate for its patents, resolving the FRAND contract claim will actually be far simpler than resolving the patent claims. As Motorola has frequently noted, there are twenty patents at issue in this case. Each of the patent claims will require discovery into the complicated technologies underlying the patents and the accused products, resolution of multiple *Markman* issues, and determinations of infringement, validity, and enforceability, **as well as** consideration of damages, including a "reasonable royalty rate" for the patents. In contrast, RIM's FRAND contract claim requires **only** an assessment of the appropriate FRAND royalty rate.

Motorola claims that determining the FRAND royalty rate will be an "onerous task" that no court has yet undertaken. Motorola Br. at 26. It is certainly true that RIM's FRAND contract claim raises an issue that has been the subject of significant professional and academic commentary. However, the Northern District of Texas has considerable experience in this area. In fact, Judge Lynn has overseen two highly visible and significant cases implicating FRAND/RAND royalty issues in cases involving patent claims based on GSM patents. *See Ericsson Radio Sys., Inc. v. Interdigital Commc'ns Corp.*, No. 93-CV-1809 (N.D. Tex. filed

Sept. 9, 1993); *see also Harris Corp. v. Ericsson, Inc.*, No. 98-CV-2903 (N.D. Tex. filed Dec. 10, 1998).  The District of Delaware also has overseen a FRAND/RAND royalty issue in a case involving patent claims based on essential patents.  *See Motorola, Inc. v. Interdigital Tech. Corp.*, No. 93-CV-00488 (D. Del. filed Oct. 8, 1993).

Moreover, at least three other courts are presently addressing claims for breach of a FRAND contract.  *See Nokia Corp. v. Qualcomm, Inc.*, C.A. No. 2330-VCS (Del. Ch. filed Aug. 9, 2006); *Broadcom Corp. v. Qualcomm Inc.*, No. 05-CV-03350 (D.N.J. filed Jul. 1, 2005); *Samsung Elecs. Co. v. Interdigital Commc'ns Ltd., et al.*, No. 07-CV-00167 (D. Del. filed Mar. 23, 2007).  A number of other similar cases have been initiated but ultimately settled.

Motorola's suggestion that resolving the FRAND issue would require extensive analysis of the validity and essentiality of 76 patents is similarly misplaced.  No court has ever concluded that determining a FRAND rate requires such an analysis.  In fact, the District of Delaware rejected exactly such an argument in remanding the Nokia/Qualcomm controversy to state court, concluding that Nokia's FRAND claims did ***not*** present any substantial questions of federal patent law.  *Nokia Corp. v. Qualcomm, Inc.*, 2006 WL 2521328, at *1 (D. Del. Aug. 29, 2006) (interpreting FRAND contract would ***not*** require any considerations of infringement, use, or essentiality, but rather "an interpretation of . . . obligations arising after declaring certain patents essential").[25]  Motorola contends that the Delaware Chancery Court subsequently "refused to adjudicate [Nokia's] claim seeking a declaration regarding the methodology for determining FRAND terms, on the basis that doing so would require the state court to adjudicate federal patent infringement and validity issues."  Motorola Br. at 27 (*citing Nokia Corp. v. Qualcomm, Inc.*, C.A. No. 2330-VCS (Del. Ch. Oct. 27, 2007)).  In fact, the claims in that litigation – which remains pending – all revolve around FRAND issues, and the parties recently entered into a stipulation agreeing that any invalidity and infringement issues would ***not*** be raised.  *See Nokia*

---

[25]    As the court commented, "[f]or Defendant to now contend Plaintiff's claims cannot be resolved without determining whether the patents at issue are essential seems incongruent with Defendant's own declarations to the ETSI."  *Id.*, at *2.

*Corp. v. Qualcomm Inc.*, C.A. No. 2330-VCS, Doc. No. 787 (Del. Ch. Feb. 21, 2008)

(Stipulation and Order) (App. 208).[26]

Motorola also cites the FTC's decision in the Rambus controversy.  In this proceeding,

however, the FTC was able to set a "maximum reasonable royalty rate" for Rambus's patents

without any analysis of patent issues such as essentiality or validity.  *See In re Rambus*, 2007

WL 431524 (F.T.C. Feb. 5, 2007) (Opinion on Remedy), *rev'd on other grounds*, *Rambus*, 2008

WL 1795594; *see also Ericsson*, 2007 WL 1202728, at *2-3 (concluding that determining

FRAND royalty rate would not require court to consider infringement and validity).[27]

Finally, if the Court elects to order separate trials and accepts RIM's suggestion that an

early trial on the FRAND royalty rate would be the most expeditious way to proceed, the Court

can subsequently try the patent and antitrust claims in the normal course – there would be no

need to slow or delay the progress of the patent claims towards trial.[28]  Rather, RIM's suggestion

is only that moving quickly towards trial on the FRAND contract claim could substantially

narrow the issues and alleviate a primary point of contention between the parties.

---

26      Nokia's original complaint sought a determination of FRAND methodology, but not a determination of the proper FRAND royalty rate.  The Delaware Chancery Court at one point suggested that, in order for it to make such a determination, Qualcomm would have to make a binding declaration as to which patents were essential to the relevant standard, and Nokia would have to make a binding declaration as to whether those claimed-essential patents were in fact used and, in the absence of a license, infringed.  *See* Motorola App. 61.  However, the court made no such ruling, and certainly did not "refuse to adjudicate" the FRAND claim.  Instead, as referenced above, the FRAND claims remain pending.

27      *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 312 n. 8 (3d Cir. 2007), and *ESS Tech., Inc. v. PC-Tel, Inc.*, 2001 WL 1891713 (N.D. Cal. Nov. 28, 2001), cited by Motorola in support of its assertion that a patent-by-patent analysis is required to determine the FRAND royalty rate, are not to the contrary.  Neither of those decisions actually made a FRAND determination, and thus the courts' suggestions that analysis under the framework set forth by *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), would be appropriate were, as Motorola admits, mere dicta.  Motorola Br. at 27.

28      There is no reason to believe that Motorola's patent claims would reach trial any sooner in the Eastern District of Texas.  In fact, it appears that it may take longer to reach trial before Judge Ward in the Eastern District than the 21 month median time interval from filing to trial for jury trials in the Eastern District cited by Motorola.  Motorola Br. at 43, n.46.  For example, in *Thomas v. Cox Communications, Inc.*, Judge Ward scheduled jury selection to begin in November 2009, about 29 months after the complaint was filed.  No. 07-CV-00231 (E.D. Tex.), Docket Report (docket nos. 1 and 97) (App. 218); *see also In re Halftone Color Separations ('809) Patent Litigation*, 2008 WL 1393026, at *1 (J.P.M.L. Apr. 10, 2008) (noting that "current docket conditions in the Eastern District of Texas counsel against assignment of this MDL to that district where other appropriate districts are available to handle the litigation" in disregarding party's request that consolidated proceedings be transferred to the Eastern District of Texas, the location of the first-filed action).

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, RIM respectfully requests that the Court deny Motorola's

Motion to Dismiss or Stay Plaintiff's Antitrust and Contract Claims and to Dismiss, Stay or

Transfer Plaintiff's Declaratory Judgment Claims.


Dated:  May 12, 2008

Respectfully Submitted,

/s/ John R. Emerson
George W. Bramblett, Jr. (TSBN 02867000)
Phillip B. Philbin (TSBN 15909020)
John R. Emerson (TSBN 24002053)
HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

William F. Lee (Admitted *Pro Hac Vice*)
Michelle D. Miller (Admitted *Pro Hac Vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Facsimile: 617-526-5000

William J. Bohler (Admitted *Pro Hac Vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, California 94304
Telephone: (650) 858-6114
Facsimile: (650) 858-6100


**ATTORNEYS FOR PLAINTIFFS RESEARCH IN MOTION LIMITED AND
RESEARCH IN MOTION CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing RIM's Opposition Motorola's Motion to Dismiss was served on all counsel of record in accordance with the Federal Rules of Civil Procedure on May 12, 2008.

| | |
|---|---|
| Norman H Beamer<br>norman.beamer@ropesgray.com<br>Ropes & Gray LLP<br>525 University Ave<br>Palo Alto, CA 94301 | *Via ECF* |
| Angela V Colmenero<br>acolmenero@lynnllp.com<br>Lynn Tillotson & Pinker<br>750 N St Paul St<br>Suite 1400<br>Dallas, TX 75201 | *Via ECF* |
| Nicole M Jantzi<br>nicole.jantzi@ropesgray.com<br>Ropes & Gray LLP<br>700 12th St NW<br>Suite 900<br>Washington, DC 20005 | *Via ECF* |
| Jesse J Jenner<br>jesse.jenner@ropesgray.com<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036 | *Via ECF* |
| Eric W Pinker<br>epinker@lynnllp.com<br>Lynn Tillotson & Pinker<br>750 N St Paul St<br>Suite 1400<br>Dallas, TX 75201 | *Via ECF* |
| Mark E Turk<br>mturk@lynnllp.com<br>Lynn Tillotson & Pinker<br>750 N St Paul St<br>Suite 1400<br>Dallas, TX 75201 | *Via ECF* |

/s/ John R. Emerson
John R. Emerson