UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| RESEARCH IN MOTION LIMITED, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. |
| VS. | ) ) | 3:08-CV-0284-G |
| MOTOROLA, INC., | ) ) | |
| Defendant. | ) | |
| ------------------------------------------------------- | ) | **ECF** |
| MOTOROLA, INC., | ) ) | |
| Plaintiff, | ) ) | |
| VS. | ) ) | CONSOLIDATED WITH |
| RESEARCH IN MOTION LIMITED, ET AL., | ) ) ) | 3:08-CV-0317-G |
| Defendants. | ) ) | |


MEMORANDUM OPINION AND ORDER


Before the court are various motions of the defendant Motorola, Inc.

("Motorola" or "the defendant").  Motorola moves to dismiss all of the claims

brought by the plaintiffs, Research in Motion Limited and Research in Motion

Corporation (collectively, "the plaintiffs" or "RIM"). Motorola also moves, in the alternative, to bifurcate and stay RIM's antitrust and contract claims. Finally, Motorola seeks to dismiss, stay, or transfer RIM's declaratory judgment actions. For the reasons discussed below, all of the motions are denied.

## I. BACKGROUND

### A. Factual Background

This is an action brought by RIM against Motorola for patent infringement, breach of contract, and violations of the antitrust laws. *See generally* Complaint. Both Motorola and RIM are in the business of developing and marketing mobile wireless communication devices. To work properly, these devices must connect to a network provided by a mobile wireless carrier. Complaint ¶ 15. These carriers enable consumers to place and receive telephone calls, send and receive e-mails, and connect to the Internet through mobile wireless handsets. *Id.* New wireless technologies are constantly in development. But before they can be broadly commercialized, service providers and device manufacturers must agree on common technology specifications. In other words, standards must be set. *Id.* ¶ 16.

Standards are important for several reasons. First, they facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another. *Id.* ¶ 20. Standards also lower costs by increasing product manufacturing volume, and they increase price competition by eliminating

"switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another. *Id.* ¶ 21. They also lead to earlier adoption of new technology. *Id.* There is, however, one downside to standards: they create "essential patents." See *id.* ¶ 23. The term "essential patents" refers to patents that are essential to a standard -- *i.e.*, patents that claim technologies selected by a standards development organization ("SDO"). *Id.* ¶ 1. Once a patent becomes an essential patent, it gains undue significance as a result. *Id.* ¶ 5. Companies that produce products governed by a standard become "locked in" to the technologies included in the standard. *Id.* ¶ 23. Customers have no practical choice other than to buy products that comply with the standard. Thus, the owners of essential patents gain market power.

In order to reduce the likelihood that owners of essential patents will abuse their market power, SDOs have adopted rules, policies, and procedures that control the disclosure and licensing of essential patents. *Id.* ¶ 25. These rules, policies, and procedures are known as intellectual property rights policies ("IPR policies"). *Id.* IPR policies usually require owners of essential patents to commit to license those patents on fair, reasonable, and nondiscriminatory ("FRAND") terms. *Id.* ¶¶ 1, 27. These "FRAND commitments" are intended to prevent owners of essential patents from acquiring too much of the market power that would otherwise be inherent in owning an essential patent. *Id.* ¶ 28.

RIM and Motorola both produce wireless communication devices. RIM offers the well-known BlackBerry® device, with built in Wi-Fi capabilities. *Id.* ¶¶ 8, 29, 35. Motorola offers similar devices. *Id*. ¶ 10. As a result, the two companies are in direct competition. *Id.* ¶¶ 34-35. Motorola, however, is the owner of several essential patents. Its patents have been incorporated into standards set by the European Telecommunications Standards Institute ("ETSI"), and the Institute of Electrical and Electronics Engineers ("IEEE"). See *id.* ¶¶ 42, 48, 59-80. Both ETSI and IEEE require all patent owners to promise that they will license any patents incorporated into their standards on FRAND terms. *Id.* ¶¶ 60, 61, 76. Motorola's agreements with ETSI and IEEE require it to license its essential patents on FRAND terms. See *id.*

In 2003, Motorola licensed several of its essential and non-essential patents to RIM. *Id.* ¶¶ 84-86. Motorola and RIM entered into a Cellular Essential Properties Cross License Agreement ("Cross License Agreement"). *Id.* This agreement gave RIM a license to use Motorola's essential patents for five years, and provided that in 2007, the parties would begin good faith negotiations to extend the contract. *Id.* When the license expired at the end of 2007, RIM sought to enter negotiations to extend the contract. *Id.* ¶ 88. RIM avers that Motorola refused to negotiate reasonably and will not re-license the patents at a FRAND price. *Id*. ¶¶ 88-89.

RIM contends that Motorola's refusal to negotiate in good faith constitutes a breach of both the Cross License Agreement and the commitments Motorola made to IEEE and ETSI to license its essential patents on FRAND terms. *Id.* ¶¶ 162-67, 175-79. RIM also asserts a claim against Motorola under a theory of promissory estoppel. *Id.* ¶¶ 168-74. RIM maintains that Motorola promised potential licensees, via its commitments to IEEE and ETSI, that it would license its essential patents on FRAND terms. *Id*. ¶ 169. Motorola insists that because other wireless device companies, like RIM, foreseeably relied on this promise, Motorola is estopped to deny it. *Id.* ¶¶ 170-72.

RIM brings two other causes of action against Motorola. Based on Motorola's alleged failure to license its patents on FRAND terms, RIM brings a claim for violation of Section 2 of the Sherman Act. *Id.* ¶¶ 180-85. Finally, RIM asserts that Motorola has willfully infringed nine of RIM's patents. *Id.* ¶¶ 115-61.

B. <u>Procedural Background</u>

RIM filed this suit against Motorola on February 16, 2008. Only minutes later, on the same day, Motorola filed suit against RIM in the United States District Court for the Eastern District of Texas. Plaintiff Research in Motion's Notice of Supplemental Authority in Opposition to Motorola's Motion to Dismiss, Stay or Transfer ("Notice of Supplemental Authority") at 1. RIM moved to transfer Motorola's suit to the Northern District of Texas. *Id.* Judge T. John Ward of the

Eastern District granted this motion on October 17, 2008. Appendix in Support of Plaintiff Research in Motion's Notice of Supplemental Authority in Opposition to Motorola's Motion to Dismiss, Stay or Transfer ("Appendix to Notice of Supplemental Authority") at 1. His decision rested on the "first-filed" rule, holding that, although RIM filed its suit only minutes earlier than Motorola, the rule still applied. *Id.* RIM states that it will seek to consolidate Motorola's case with this one as soon as it is transferred to the Northern District of Texas. Notice of Supplemental Authority at 1.

## II. ANALYSIS

### A. The Motions to Dismiss

#### 1. 12(b)(6) Standard

"To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964-65 (citations, quotations marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above

the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 127 S.Ct. at 1965). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted) (quoting *Martin K. Eby Construction Company v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004)).

## 2. The Motion to Dismiss the Antitrust Claim

RIM's antitrust claim alleges that Motorola violated Section 2 of the Sherman Act. Complaint ¶¶ 180-85. To establish such a violation, RIM must prove two elements: (1) possession of monopoly power in the relevant market, and (2) that the monopolist achieved or is maintaining monopoly power through anticompetitive conduct. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Motorola moves to dismiss RIM's antitrust claim under Rule 12(b)(6) on three separate grounds. First, Motorola argues that it does not have monopoly power in the relevant market. Defendant Motorola, Inc.'s Brief in Support of its Motion to Dismiss or Stay Plaintiffs' Antitrust and Contract Claims; And to Dismiss, Stay or Transfer Plaintiffs' Declaratory Judgment Patent Claims ("Motion to Dismiss") at 11. Second, Motorola argues that RIM has not pled that Motorola engaged in anticompetitive conduct. *Id.* Finally, Motorola asserts that RIM has not

pled that the injury it suffered was an antitrust injury. *Id.* These grounds are discussed separately below.

a. *Does Motorola Have Monopoly Power?*

It is not clear that Motorola intends its alleged lack of monopoly power to be a ground for dismissal. Motorola's Motion to Dismiss merely references this argument obliquely in a footnote. The court will nevertheless address it briefly.

Motorola's sole argument on this point is that its mere ownership of essential patents does not per se bestow market power. Motion to Dismiss at 15 n. 18. Motorola's support for this contention comes from *Illinois Tool Works Inc. v. Independent Ink, Inc.*, which states that the Federal Trade Commission should not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner. 547 U.S. 28, 45-46 (2006). RIM, however, correctly points out that this statement merely sets forth the uncontroversial proposition that "a patent does not necessarily confer market power upon the patentee." *Id.* at 45. *Independent Ink* does not address holders of *essential* patents, that is, patents that are incorporated into a standard. Essential patents are very different from normal patents, as the Third Circuit explains in *Broadcom Corporation v. Qualcomm Incorporated*, 501 F.3d 297, 314 (3rd Cir. 2007). *Broadcom* states that non-essential patents do not confer monopoly power upon the owner because the value of a patent "is limited when alternative technologies exist." *Id.* A standard, however, by definition, eliminates alternative

technologies. *Id.* As a result, a patent's value is "significantly enhanced . . . after the patent is incorporated in a standard." *Id.* Motorola's off-hand argument that it does not have a monopoly just because it has a patent is therefore unpersuasive. The argument fails to address the key fact that Motorola owns an *essential* patent. For these reasons, the court denies Motorola's motion to dismiss RIM's antitrust claim on this ground.

b. *Has RIM Suffered an Antitrust Injury?*

Next, Motorola argues that RIM has not pled that it suffered an antitrust injury. Motion to Dismiss at 11. RIM seeks treble damages under Section 4 of the Clayton Act for Motorola's alleged violation of Section 2 of the Sherman Act. Plaintiff Research in Motion's Opposition to Defendant Motorola, Inc.'s Motion to Dismiss or Stay Plaintiff's Antitrust and Contract Claims and to Dismiss, Stay or Transfer Plaintiffs' Declaratory Judgment Patent Claims ("Response") at 25. When a private plaintiff seeks damages under Section 4 of the Clayton Act, that plaintiff must show not only injury to its business or property, but also that the injury is an antitrust injury. *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). The Court in *Norris* defined an antitrust injury as an "injury of the type the antitrust laws were intended to prevent." *Id.* In other words, the injury "should reflect the anticompetitive effect . . . of the violation." *Id.*

RIM claims it has suffered the following injuries as a result of Motorola's conduct:

> a) The threat of being forced to pay supracompetitive royalties;
>
> b) The uncertainty created by Motorola's refusal to recognize the FRAND license and negotiate a FRAND rate;
>
> c) The inability to obtain licenses to Motorola's essential patents on FRAND terms, and
>
> d) Injury to its business and property, specifically, the threat of imminent loss of profits, loss of current and potential customers, and loss of goodwill and product image.

Response at 25-27. This list of injuries all stem from the same complaint: that Motorola has refused to honor its promise to offer its patents on FRAND terms. RIM claims this refusal has left it in a Catch-22. On the one hand, RIM could acquiesce to Motorola's non-FRAND terms. On the other hand, if it refuses to do so, its products (such as the Blackberry®) will no longer meet the SDOs' standards and RIM will be at a major competitive disadvantage. RIM argues that antitrust laws were designed to prevent just this sort of situation, and that it has therefore suffered an antitrust injury. Response at 26.

Assuming, as the court must at this stage of the proceedings, that all these facts are true, it is clear that RIM has suffered injuries as a result of Motorola's conduct. To qualify as *antitrust* injuries, however, they must be "of the type the antitrust laws

were intended to prevent." *Norris*, 500 F.3d at 465.  It is axiomatic that the antitrust laws were designed to protect "competition[,] not competitors."  *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  This means that RIM must plead more than just the injuries it has sustained; it must also show that Motorola's conduct negatively affects competition.  *Id.*

RIM argues that Motorola's conduct has harmed competition.  In fact, it asserts that Motorola's conduct has "***eliminated*** -- let alone injured -- competition in the relevant upstream technologies markets."  Response at 24 (emphasis in original).  In essence, RIM argues, Motorola's possession of an essential patent has turned Motorola into a gatekeeper.  See *id.*  Any company wishing to compete with Motorola has to have its permission, giving it the power to eliminate all competition, should it so desire.  RIM argues that the danger for abuse inherent in Motorola's position is the very reason IEEE and ETSI required Motorola to promise it would allow competitors to "pass through the gates" on FRAND terms.  Complaint ¶¶ 23-28.  The court agrees.  Even if Motorola's conduct does not eliminate competition entirely, it has the power to harm it.  If Motorola licenses only at exorbitant rates, it will force its competitors to increase prices in the downstream market in order to make a profit.  This increase in prices for all products except Motorola's will harm competition.  See *Anago, Inc. v. Tecnol Medical Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (holding

that "[t]ypical anticompetitive effects include increased prices and decreased output"), *cert. dismissed*, 510 U.S. 985 (1993).

There are several cases supporting RIM's contention that Motorola's behavior is harmful to competition. The United States Supreme Court, as well as several circuit courts, have held that this type of gate-keeping causes exactly the kind of harm antitrust laws are designed to prevent. In *Allied Tube & Conduit Corporation v. Indian Head, Inc.*, 486 U.S. 492 (1988), the Supreme Court addressed both the risks and benefits of standard-setting. The case involved a steel manufacturing corporation that set out to convince an SDO not to change its standards in a way that would negatively affect steel manufacturers. *Id.* at 495-97. The standards-setting organization, the National Fire Protection Association, published the National Electric Code each year. Until 1981, the Code had approved only steel as an electrical conduit. When a new material suitable for use as an electrical conduit became available, the steel company rounded up everyone it could to vote against incorporating this new material into the code as another viable material for electrical conduits. *Id.* (stating the facts). The issue in the case was whether this behavior violated Section 1 of the Sherman Act by unreasonably restraining trade or whether the steel company was immune from such liability because it was merely lobbying a legislative body for the result it desired. *Id.* at 495 (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (providing antitrust

immunity for individuals who petition the government to adopt a rule or law that would restrain trade)).

The Court held that the steel company did not enjoy any such immunity. *Id.* at 509-10. The Court noted the benefits of standards, stating that they "can have significant procompetitive advantages" when they are "based on the merits of objective expert judgments." *Id.* at 501. But the Court was quick to point out that in order for any procompetitive advantages to come out of the existence of standards, the standards-setting organizations must have "procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Id.* Otherwise, a standard is nothing more than an implicit "agreement not to manufacture, distribute, or purchase certain types of products." *Id.* The Court held that the steel company, which had a clear economic interest in stifling competition from this new material, was biasing the process. It therefore refused to grant the steel company antitrust immunity. *Id.* at 509-10.

Although the issue in *Allied Tube* was very different than the issue here, the case highlights the importance of keeping biased entities out of the standard-setting process. The opinion implies that, without safeguards against bias, the very existence of standards is inherently anti-competitive. *Id.* at 501. In 2007, the Third Circuit applied the holding of *Allied Tube* to a set of facts remarkably similar to those at hand. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 257 (3d Cir. 2007), involved two

mobile wireless telephone companies, Broadcom Corporation ("Broadcom") and

Qualcomm, Inc. ("Qualcomm"). Broadcom filed suit against Qualcomm, alleging that

Qualcomm, a member of ETSI, had convinced ETSI to incorporate its technology

into its standards "in reliance on . . . Qualcomm's commitment to license that

technology on FRAND terms." *Id.* at 304. Broadcom argued that Qualcomm had

later gone back on its word, and was "withholding favorable pricing" in order to

obtain a bigger market share. *Id.* Based on these factual allegations, the complaint

asserted a claim under Section 2 of the Sherman Act. *Id.* at 305.

Qualcomm brought a Rule 12(b)(6) motion to dismiss in the district court.

The district court granted the motion. The opinion reasoned that, although

Qualcomm may have tricked ETSI into incorporating its technology into the

standard, this was "of no moment under antitrust law . . . because no matter which

company's patented technology ultimately was chosen, the adoption of a standard

would have eliminated competition." *Id.* at 305. In other words, the district court

believed that standards inevitably eliminated competition, and that FRAND

commitments were powerless to stop it. The Third Circuit reversed. The Circuit

opinion criticized the lower court for failing to realize the importance of the FRAND

commitments. The court stated that the district court failed to even consider that

"the FRAND commitments that SDOs required of vendors were intended as a

bulwark against unlawful monopoly." *Id.* Alternatively, the court stated, the "SDOs

- 14 -

might have chosen nonproprietary technologies for inclusion in the standard." *Id.* In short, the court pointed out, there were several ways the SDOs might have prevented the use of standards from automatically granting monopoly power to essential patent holders. *Broadcom* held that FRAND commitments are one such method. *Id.* This court finds the reasoning in *Broadcom* persuasive and joins the Third Circuit in concluding that these FRAND commitments are intended as a "bulwark" against the unlawful accumulation of monopoly power that antitrust laws are designed to prevent. Thus, Motorola's efforts to side-step this bulwark, as alleged in this case, are harmful not only to RIM but to competition in general.

In order for RIM to properly plead that it has suffered an antitrust injury, it must show not only injury to itself but injury to competition as well. *Brunswick*, 429 U.S. at 489. RIM has sufficiently alleged harm to competition. Both the Third Circuit, in *Broadcom*, and the Supreme Court, in *Allied Tube*, have stated that standards, without the proper safeguards, are inherently anticompetitive. It follows that when an entity side-steps these safeguards in an effort to return the standard to its natural anti-competitive state, anti-competitive effects are inevitable. Motorola's breach of the commitments to IEEE and ETSI, as a result, is harmful to competition. RIM has properly pled harm to both itself and to competition. Motorola's motion to dismiss on this ground is denied.

c.  *Was Motorola Engaged in Anticompetitive Conduct?*

Motorola's final argument in support of its motion to dismiss the antitrust claim is that Motorola was not engaged in anticompetitive conduct.  Motion to Dismiss at 11.  The court has already concluded that, according to the allegations in the complaint, Motorola's conduct is harmful to competition.  Motorola's role as a gatekeeper gives it the power to eliminate, and thus to harm, competition.  If, as RIM pleads, Motorola has abused this position, such conduct will harm or eliminate competition.  Harm or elimination of competition, however, is *not* unlawful under the Sherman Act.  See *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  In fact, the law encourages attainment of monopoly by squeezing out competitors.  As the United States Supreme Court observed recently, "The mere possession of monopoly power, and the concomitant charging of monopoly prices is not only not unlawful, it is an important element of the free-market system." *Id.*  As a result, the Sherman Act only makes possession of monopoly power illegal if it is "accompanied by an element of anticompetitive *conduct*." *Id.*  Here, although it is easy to see how Motorola's role as "gatekeeper" gives it monopoly power that could easily harm competition, the law requires more than this before liability may be imposed under the Sherman Act. *Id.*  For the harm to competition to be actionable, RIM must show that it was brought about by anticompetitive conduct, as opposed to "growth or development as a consequence of

a superior product, business acumen, or historic accident." *United States v. Grinnell Corporation*, 384 U.S. 563, 570-71 (1966).

RIM pleads that IEEE and ETSI did not incorporate Motorola's technology into their standards because of Motorola's business acumen or because its technology was superior. Instead, RIM asserts, IEEE and ETSI relied on Motorola's false promises that it would license its patents on FRAND terms. Response at 15. To survive a motion to dismiss, the law merely requires that a factual allegation "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*, 495 F.3d at 205 (internal quotation marks omitted) (quoting *Twombly*, 127 S.Ct. at 1965). As a result, this court must accept as true the allegation that Motorola obtained its position of power in the market not as a consequence of a superior product, business acumen or historic accident, but by misrepresenting its intentions. Motorola's motion to dismiss RIM's antitrust claim on the grounds that Motorola did not engage in anticompetitive conduct is therefore denied.

### 3. The Motion to Dismiss RIM's Contract Claims

RIM argues that Motorola has breached two separate contracts. First, RIM argues that Motorola has breached the contracts it made with IEEE and ETSI to license its patents on FRAND terms. Complaint ¶ 83. Next, RIM argues that Motorola breached the contract it made with RIM in March of 2003. *Id.* ¶ 84. On

March 28, 2003, Motorola and RIM entered into the Cross License Agreement. This agreement gave RIM license to use Motorola's essential patents for five years, and provided that in 2007, the parties would begin good faith negotiations to extend the contract. *Id.* ¶ 85. During the course of this five years, RIM's share of handset sales grew, while Motorola's shrank. *Id.* ¶ 87. RIM argues that Motorola sought to regain its place in the market by demanding non-FRAND royalties with respect to its essential patents. *Id.* ¶ 88. RIM contends that such conduct breaches the Cross License Agreement and the agreements Motorola made with IEEE and ETSI.

Motorola argues that these breach of contract claims should be dismissed. First, it contends that RIM has not adequately pled that Motorola breached its obligation to license the essential patents on FRAND terms. Motion to Dismiss at 20. All RIM can prove, it contends, is that the two parties have not yet agreed to FRAND terms. *Id.* at 16. Motorola points out that just because the parties have not yet settled on FRAND terms does not mean Motorola is unwilling to license the patent on FRAND terms. *Id.*

This argument fails. RIM's complaint alleges that Motorola "has refused to extend FRAND . . . licensing terms to RIM for any of Motorola's purportedly essential patents . . . and has instead demanded of RIM terms that are unfair, unreasonable, and, on information and belief, discriminatory." Complaint ¶ 83. Motorola's argument merely contradicts the factual accuracy of this statement. At

this stage of the case, the court takes RIM's pleadings as true. RIM has adequately pled that Motorola did not honor its promise to license on FRAND terms. Motorola's contention otherwise is entitled to no weight on a Rule 12(b)(6) motion.

Motorola's second argument in support of dismissing the contract claims is that RIM has not suffered any damages. Motion to Dismiss at 20. The defendant contends that even if it has breached its agreements with RIM or the SDOs, eventually RIM will receive a FRAND license; either this court will determine FRAND terms or the parties will settle on FRAND terms on their own. *Id.* at 20-21. Either way, it contends, RIM will incur no injury.

This argument is inherently flawed. Motorola argues that RIM has two paths before it, both of which lead to fair licensing terms. One of these paths is this court; the other is negotiation outside the court. RIM pleads -- and the court must accept as true at the Rule 12(b)(6) stage -- that Motorola has already refused to negotiate fair terms outside this court. Motorola has blocked that path. Now, Motorola argues, the court should block the only other available path by dismissing this case. Motorola is correct that, in the end, RIM will receive fair licensing terms. But if those terms must be dictated by this court, it cannot dismiss the action before it has a chance to do so. The court will not dismiss RIM's breach of contract claims on the ground that it has suffered no injury.

B.  The Motion to Bifurcate and Stay the
Antitrust and Contract Claims

Motorola argues that if the court does not dismiss RIM's contract and antitrust claims, it should bifurcate those claims from the patent infringement claims pursuant to Federal Rule of Civil Procedure 42(b).  Motion to Dismiss at 23.  It also urges the court to stay those claims pending resolution of the patent claims.  Motorola argues that bifurcating and staying these claims will achieve judicial economy and efficiency. *Id.*

Motorola's desire to have the claims bifurcated appears to arise from its desire to try the patent claims in the United States District Court for the Eastern District of Texas.  Motorola originally filed its patent infringement claims against RIM in the Eastern District.  Notice of Supplemental Authority at 1.  When RIM moved to transfer that case to the Northern District of Texas for possible consolidation with this case, Motorola vigorously opposed the motion and fought to keep the case in the Eastern District.  Ultimately, Motorola lost that fight.  Judge T. John Ward in the Eastern District transferred Motorola's suit against RIM to the Northern District of Texas on October 17, 2008.  Appendix to Notice of Supplemental Authority at 1. Motorola filed the briefs supporting the instant motion before Judge Ward granted RIM's motion to transfer.  As a result, Motorola's argument assumes that its case against RIM is still pending in the Eastern District.  It argues that both parties have been involved in patent lawsuits in the Eastern District and that the court there is

"already very familiar with the parties, their products, and the technological background common to the Motorola and RIM patent actions." Defendant Motorola, Inc.'s Reply Brief in Support of its Motion to Dismiss or Stay Plaintiffs' Antitrust and Contract Claims; and to Dismiss, Stay or Transfer Plaintiffs' Declaratory Judgment Patent Claims at 17. In short, Motorola argues that this court is equipped to handle its antitrust and contract claims, but that the Eastern District is better equipped to decide the patent infringement claims. This case, however, no longer has any connection with the Eastern District of Texas. Judge Ward transferred Motorola's suit against RIM to the Northern District of Texas. Notice of Supplemental Authority at 1-2. Therefore, the court will not bifurcate the patent claims from the antitrust and contract claims so that the patent claims may be tried in the Eastern District.

### C. The Motion to Dismiss or Transfer RIM's Declaratory Judgment Claims

Motorola's final request is that the court dismiss, stay, or transfer RIM's declaratory judgment patent claims in favor of Motorola's Eastern District of Texas action. Motion to Dismiss at 29-30. RIM filed a declaratory judgment action that Motorola claims is the "mirror image" of its claims against RIM filed in the Eastern District of Texas. *Id.* at 29. In the alternative, Motorola requests that the court stay the declaratory judgment actions pending resolution of the claims in the Eastern District, or transfer the claims to the Eastern District for consolidation. *Id.* As

discussed above, Judge Ward of the Eastern District has already transferred

Motorola's suit against RIM to the Northern District of Texas. Appendix to Notice

of Supplemental Authority at 1-2. Motorola's request that the court dismiss stay or

transfer RIM's claims in favor of the Eastern District case is denied as moot.

### III. CONCLUSION

For the reasons discussed above, Motorola's motions to dismiss, bifurcate, stay,

or transfer RIM's claims are **DENIED**.

**SO ORDERED**.

December 11, 2008.

A. JOE FISH
**Senior United States District Judge**